IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:15-CV-42-BO

| | |
|---|---|
| RED WOLF COALITION, *et al.*, <br>     Plaintiffs, <br> <br> v. <br> <br> UNITED STATES FISH AND WILDLIFE <br> SERVICE, *et al.*, <br>     Defendants. | ) <br> ) <br> ) <br> )     ORDER <br> ) <br> ) <br> ) <br> ) |

This cause comes before the Court on defendants' motion to limit the standard and scope of review and plaintiffs' motion for preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. The motions have been fully briefed and are ripe for adjudication. A hearing was conducted on the motion for preliminary injunction before the undersigned on September 14, 2016, at Raleigh, North Carolina. For the reasons that follow, defendants' motion to limit the standard and scope of discovery is granted in part and plaintiffs' motion for preliminary injunction is granted.

## BACKGROUND

I.    FACTUAL BACKGROUND

This Court and the Fourth Circuit have addressed the history and background of the red wolf and the red wolf recovery program in two prior cases. *See Gibbs v. Babbitt*, 214 F.3d 483, 488 (4th Cir. 2000); *Gibbs v. Babbitt*, 31 F. Supp. 2d 531, 532 (E.D.N.C. 1998), *Red Wolf Coal. v. N. Carolina Wildlife Res. Comm'n*, No. 2:13-CV-60-BO, 2014 WL 1922234, at *1 (E.D.N.C. May 13, 2014). The Court incorporates its earlier factual recitations by reference and provides

the following summary background of the red wolf and the program initiated to recover it as alleged by plaintiffs in their second amended complaint.

The red wolf was once common in the eastern and south-central United States but its populations were destroyed by active predator control programs and the degradation of habitat. [DE 37 ¶ 70]. The red wolf was designated as endangered in 1967 under the precursor to the ESA and was declared extinct in the wild by 1980. *Id.* ¶¶ 71, 74. In 1987, four pairs of captive-bred red wolves were released in the Alligator River National Wildlife Refuge as an experimental population under Section 10(j) of the ESA. 16 U.S.C. § 1539(j); *id.* ¶ 75. The red wolf recovery area later was expanded to encompass approximately 1.7 million acres across five counties in eastern North Carolina. *Id.* ¶ 77. In 1999, the red wolf adaptive management plan was introduced and implemented by the red wolf recovery program field team, headquartered at Alligator River National Wildlife Refuge. [DE 37-12].

By the late 1990s, the wild red wolf population had grown to 100 wolves, peaking at 130 wolves in 2006. *Id.* ¶¶ 79-80. In June 2015, USFWS estimated that between 50 and 75 red wolves existed in the wild; the population estimate was again decreased in March 2016 to between 45 and 60 red wolves in the wild. *Id.* ¶¶ 82, 83. Red wolf mortalities are attributable to both natural and human causes, including gunshot and vehicle strikes. *Id.* ¶ 85; [DE 37-14]. The red wolf is considered to be one of the most endangered canids in the world. [DE 37-6].

The red wolf is designated as a nonessential experimental population, and Section 10(j) of the ESA provides the USFWS with flexibility in how it manages these populations in furtherance of their conservation. [DE 37 ¶¶ 41-44]. The 10(j) rules for the red wolf were adopted in 1986. *Id.* ¶ 45. These rules address the circumstances under which a red wolf may be taken, which term is defined by the ESA to mean "harass, harm, pursue, hunt, shoot, wound, kill,

trap, capture collect or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The red wolf 10(j) rules provide that no one may take a red wolf except in the following circumstances:

> (3) Any person with a valid permit . . . may take red wolves for educational purposes, scientific purposes, the enhancement of propagation or survival of the species, zoological exhibition, and other conservation purposes consistent with the Act and in accordance with applicable State fish and wildlife conservation laws and regulations;
>
> (4)(i) Any person may take red wolves found on private land [within the red wolf recovery area], Provided that such taking is not intentional or willful, or is in defense of that person's own life or the lives of others; and that such taking is reported within 24 hours [to the appropriate party].
> (ii) Any person may take red wolves found on lands owned or managed by Federal, State, or local government agencies in the areas defined in paragraphs (c)(9)(i) and (ii) of this section, Provided that such taking is incidental to lawful activities, is unavoidable, unintentional, and not exhibiting a lack of reasonable due care, or is in defense of that person's own life or the lives of others, and that such taking is reported within 24 hours . . ..
> (iii) Any private landowner, or any other individual having his or her permission, may take red wolves found on his or her property [in the red wolf recovery area], Provided that all such harassment is by methods that are not lethal or physically injurious to the red wolf and is reported within 24 hours . . ..
> (v) Any private landowner may take red wolves found on his or her property [in the red wolf recovery area] after efforts by project personnel to capture such animals have been abandoned, Provided that the Service project leader or biologist has approved such actions in writing and all such taking shall be reported within 24 hours . . ..
> (vi) The provisions of paragraphs (4)(i) through (v) of this section apply to red wolves found in areas outside [the red wolf recovery area], with the exception that reporting of taking or harassment to the refuge manager, Park superintendent, or State wildlife enforcement officer, while encouraged, is not required.
>
> (5) Any employee or agent of the Service or State conservation agency who is designated for such purposes, when acting in the course of official duties, may take a red wolf if such action is necessary to:
> (i) Aid a sick, injured, or orphaned specimen;
> (ii) Dispose of a dead specimen, or salvage a dead specimen which may be useful for scientific study;
> (iii) Take an animal that constitutes a demonstrable but non-immediate threat to human safety, or which is responsible for depredations to lawfully present domestic animals or other personal property, if it has not been possible to otherwise eliminate such depredation or loss of personal property, Provided That such taking must be done in a humane manner, and may involve killing or

3

> injuring the animal only if it has not been possible to eliminate such threat by live
> capturing and releasing the specimen unharmed on the refuge or Park;
> (iv) Move an animal for genetic purposes.

50 C.F.R. § 17.84(c)(3)-(5). It is further unlawful to cause a prohibited take to be committed, *id.* at (c)(8), and

> Any animal that is determined to be in need of special care or that moves onto
> lands where the landowner requests their removal will be recaptured, if possible,
> by Service and/or Park Service and/or designated State wildlife agency personnel
> and will be given appropriate care. Such animals will be released back into the
> wild as soon as possible, unless physical or behavioral problems make it
> necessary to return the animals to a captive-breeding facility.

*Id.* at (c)(10).

## II.  PROCEDURAL BACKGROUND

Plaintiffs are three non-profit public interest organizations that advocate on behalf of the wild red wolf population as well as other animals which are endangered or threatened with extinction. Each plaintiff organization has members and supporters in North Carolina. Plaintiff Red Wolf Coalition specifically works with the United States Fish and Wildlife red wolf recovery program on red wolf restoration and management issues. Defendants are the United States Fish and Wildlife Service, its Director, and the appropriate regional director.

Plaintiffs originally filed their complaint for declaratory and injunctive relief in November 2015, alleging that the United States Fish and Wildlife Service (USFWS or the Service) and other defendants have violated Sections 4, 7, and 9 of the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, and that defendants have failed to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-47. Plaintiffs challenge defendants' actions in authorizing the lethal or non-lethal take of red wolves on private land without first satisfying the requirements of the governing regulations and in shifting their efforts and

4

administering the red wolf rules and regulations in a manner resulting in a failure to provide for the conservation of the wild red wolf population.

After answering plaintiffs' complaint, defendants on June 14, 2016, filed a motion to limit the standard and scope of review. On June 20, 2016, plaintiffs moved for a preliminary injunction, and on June 23, 2016, plaintiffs were permitted to file a second amended complaint without opposition from defendants.

## DISCUSSION

### I. MOTION TO LIMIT THE STANDARD AND SCOPE OF REVIEW

USFWS asks the Court to limit its review of plaintiffs' claims to the administrative record and to decide the claims on cross-motions for summary judgment, arguing that the Administrative Procedure Act's (APA) scope and standard of review apply to plaintiffs' claims under the ESA and NEPA, that discovery outside the administrative record should not be allowed, and that the APA standard of review – whether USFWS' actions were arbitrary, capricious, an abuse of discretion, or otherwise contrary to law – is applicable. 5 U.S.C. §§ 706; 706(2)(A).

Plaintiffs do not challenge the red wolf rules or regulations themselves. Rather, plaintiffs challenge the way in which the Service is currently interpreting and implementing the governing rules and regulations. Five of plaintiffs' six claims for relief are pursuant to the citizen suit provision of the ESA. The citizen suit provision of the ESA allows any person to commence a civil suit on his own behalf to enjoin any person, including a governmental agency, who is alleged to be in violation of the ESA. 16 U.S.C. § 1540(g)(1)(A). The provision "is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties—both private entities and Government agencies—but is not an alternative avenue for

5

judicial review of the Secretary's implementation of the statute." *Bennett v. Spear*, 520 U.S. 154, 173 (1997).

The Ninth Circuit has held that because the citizen suit provision of the ESA provides an independent basis for a private right of action, a sufficient avenue of review exists and a plaintiff's claims need not proceed under the APA. *Washington Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005). Although the Fourth Circuit has found that the appropriate *standard* of review in citizen suits brought under the Clean Water Act, an analogous statute to the ESA, is the APA's arbitrary and capricious standard, its holding did not address the *scope* of review permitted for such claims. *See Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 316 (4th Cir. 1988); *see also Conservation Cong. v. Finley*, No. C 11-04752 SC LB, 2012 WL 1564946, at *5 (N.D. Cal. May 2, 2012) (discussing distinction between scope and standard of review under APA and ESA citizen suits).

This Court is persuaded by the authority cited by plaintiffs that discovery should be permitted on their ESA citizen suit claims. Indeed, plaintiffs' "claims do not challenge specific administrative decisions, and [i]nstead . . . advance an enforcement action and require proof of harm and causation." *Oregon Nat. Desert Ass'n v. Kimbell*, 593 F. Supp. 2d 1217, 1220 (D. Or. 2009). Similar reasoning is applicable to plaintiffs' failure to act claim under NEPA. *See, e.g., Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) ("if an agency fails to act, there is no 'administrative record' for a federal court to review"). Further, courts have expressly held that discovery is appropriate for claims brought under Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(G). Where, as here, a Section 9 claim seeks injunctive relief, such relief is forward looking, and thus limitation to an administrative record may not provide a sufficient basis upon which a court can consider the

propriety of the defendant's actions. *See Oregon Nat. Desert Ass'n*, 593 F. Supp. 2d at 1220 ("[w]hatever evidence ONDA can develop to prove that unlawful take has occurred is appropriate, which will enable the court to fully determine whether the Forest Service violated ESA § 9 by allowing the excessive take") (internal quotation and citation omitted).

However, because the ESA and NEPA provide no standard of review, the Court will apply the APA's arbitrary and capricious standard to plaintiffs' claims. *Hanson*, 859 F.2d at 316; *see also Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984) ("Because ESA contains no internal standard of review, section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, governs review of the Secretary's actions."); *Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1099 (D. Ariz. 2009) (NEPA like ESA provides no standard of review and APA standard thus applicable in case against USFWS and United States Forest Service). Defendants' motion requesting the Court limit the scope and standard of review is therefore granted in part and denied in part.

II. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction to enjoin defendants from conducting or authorizing the take of wild red wolves on private land where the subject wolf has not been demonstrated to be a threat to humans, pets, or livestock. "A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (quotation and citation omitted). A movant must make a clear showing of each of four elements before a preliminary injunction may issue: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009).

    A.    *Likelihood of success on the merits*

Plaintiffs bring claims under Sections 4 and 7 of the ESA[1] and NEPA. "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they need not show a certainty of success." *League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (internal quotation omitted) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)).

(i) ESA

Plaintiffs' ESA claims center on their allegation that the Service has reinterpreted the red wolf rules to allow for an increase in the authorized take of red wolves.[2] Specifically, plaintiffs allege that prior to 2014 and beginning with the Service's 1999 guidelines for applying red wolf rules, the Service interpreted its red wolf rules and regulations to allow only for the authorized take of problem wolves – that is, wolves which had been demonstrated to be a threat to pets or livestock or which were exhibiting inappropriate behavior that indicated they may become a more serious problem, such as tolerance of people or dwellings. [DE 32-15 at 8; 14-15]. This interpretation reflected the Service's opinion that removal or take of non-problem red wolves "may be detrimental to the conservation of the species," which would plainly violate the ESA's mandate, even as applied to a nonessential experimental population such as this. [DE 32-16 at 3] (noting that interpretation of the red wolf rules to remove only problem wolves was "in tune with

---

[1] Plaintiffs state that they reserve their ESA Section 9 claim for consideration of the case on the merits. [DE 32 at 12].
[2] Plaintiffs also bring a Section 4 ESA claim alleging that the Service has failed to complete the mandatory five-year status review required by 16 U.S.C. § 1533(c)(2).

8

traditional wildlife management concepts and laws. Wildlife are not the property of landowners but belong to the public and are managed . . . for the public good.").

Plaintiffs allege that beginning in 2014, the Service refocused its efforts in response to pressure from the North Carolina Wildlife Commission and vocal landowners opposed to the red wolf recovery program. In 2014, USFWS received 228 letters from individuals requesting that red wolves be removed from their property. [DE 32-11] The Service determined that ninety-three percent of the letters were "dead-ends," which included letters received from individuals who did not have an issue with red wolves on their property, did not have red wolves on their property, or did not know they were signing a request for removal. *Id.* However, as plaintiffs allege, a message had been conveyed from the community that support for the red wolf program was lacking. In January 2015, the North Carolina Wildlife Resource Commission passed resolutions urging the Service to end the red wolf program and declare the red wolf extinct in the wild. [DE 32-23]. Five months later, in June 2015, the Service announced that it would be terminating its practice of reintroducing red wolves into the red wolf recovery area as well as its adaptive management program in which coyotes and red-wolf hybrids were sterilized and reintroduced into the recovery area to hold space and prevent red wolf-coyote hybridization. Wheeler Decl. ¶¶ 16-18 [DE 32-3].

Section 4(d) of the ESA requires that the red wolf rules must provide for the conservation of the listed species. 16 U.S.C § 1533(d); *see also Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d at 1116 (10(j) rules are "by definition the promulgation of the protective regulations for the species pursuant to the authority of ESA section 4(d)."). Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), "*requires* the Secretary [of the Interior] and the heads of all other Federal departments and agencies to use their authorities in order to carry out programs for the protection

of endangered species." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 182-83 (1978) (citation omitted) (emphasis added in *Tennessee Valley Authority*). Section 7(a)(2) of the ESA requires that each federal agency consult with the Secretary of the Interior ensure that agency action is not likely to jeopardize the continued existence of any endangered or threatened species. 16 U.S.C. § 1536(a)(2); *see also Florida Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008) (Section 7(a)(2) imposes two obligations on federal agencies, the first being "procedural and requir[ing] that agencies consult with the FWS to determine the effects of their actions on endangered or threatened species and their critical habitat" and the second being "substantive and requir[ing] that agencies insure that their actions not jeopardize endangered or threatened species or their critical habitat.").

Plaintiffs have sufficiently demonstrated that the Service's actions after 2014 in regard to its management of the wild red wolf population fail to adequately provide for the protection of red wolves and may in fact jeopardize the population's survival in the wild in violation of Sections 4 and 7 of the ESA.[3] Expanding its interpretation of the take rules necessarily affects the health of the wild red wolf population as it results in greater numbers of both intended as well as unintended mortalities. For example, in June 2015, defendants issued authorization to a landowner to lethally take a red wolf under 50 C.F.R. § 17.84(c)(4)(v). [DE 32-14]. The Service indicated that it was authorizing the landowner's lethal take because at least one possible red wolf continued to occupy the subject land and the landowner refused to allow the Service access to the property to capture the animal. *Id.* at 6-7. The Service determined that it must therefore abandon its efforts to capture and relocate the animal and that issuance of a lethal take permit was appropriate. *Id.* The landowner's authorized take of red wolf on property concerned a six

---

[3] The Court notes that a movant need not necessarily demonstrate a likelihood of success on all claims in order to obtain a preliminary injunction. *Pashby v. Delia*, 709 F.3d at 328.

year old wild-born female which had produced four known litters and was possibly still nursing pups. *Id.* at 2. The Service was permitted onto the property to retrieve the carcass. *Id.*

Defendants rely on a provision of the red wolf rules which allows the Service to recapture red wolves on landowner request, if possible, to argue that the take of wolves at landowner request is a sanctioned activity under the regulations that the Service should not be faulted for following the law. 50 C.F.R. § 17.84(c)(10). This provision clearly does not authorize a legal lethal take of a red wolf simply upon landowner request. Defendants further contend that there has been no change in the Service's interpretation of the red wolf rules, or that if there has been it is only to come into compliance with the rules, and that none of its current actions could be considered to be at odds with the protection of the species or causing the red wolf's existence to be jeopardized.

Such argument is difficult to square, however, with the drastic decline in the wild red wolf population over the last two years. Following reintroduction, the wild red wolf population in the red wolf recovery area grew steadily, with a peak population of an estimated 130 red wolves in 2006 and as many as twenty breeding pairs in a given year. [DE 32-9]. In November 2013, there were an estimated 100 red wolves in the wild with an estimated eight breeding pairs in 2013-14. Wheeler Decl. § 19 [DE 32-3]; [DE 32-9]. In 2015, the estimated population in the wild was reduced to 50-75. In March 2016, defendants estimated there to be only 45-60 red wolves in the wild. Wheeler Decl. § 19 [DE 32-3]. Such rapid population decline has been described as a catastrophic indicator that the wild red wolf population is in extreme danger of extinction. Vucetich Decl. ¶18 [DE 32-17]. The parties point to no explanation for the population decrease other than plaintiffs' proffer that the shift in management perspective and rule interpretation by defendants is having detrimental effects. [DE 43 at 9]; *compare* [DE 45-2]

(1999 guidelines used since then with great success) *with* [DE 45-1] (first step in process of bringing program into compliance requires that all landowner removal requests be honored and that if recapture efforts are unsuccessful take authorizations are issued to landowners). Further, plaintiffs have proffered sufficient evidence that the non-lethal take of non-problem red wolves may have ripple effects beyond the one animal at issue which harm the population. Vucetich Decl. ¶ 22 (removal of wolves impacts reproduction); Prater Decl. ¶ 20 [DE 32-22] (removal of wolves increases likelihood of hybridization and pack disruption, increasing threat to integrity of red wolf population). Plaintiffs have presented sufficient evidence to demonstrate that defendants' shift in interpretation is detrimental to the recovery of the species and in violation of the ESA.

(ii) NEPA

When a federal agency undertakes actions which would significantly affect the environment, NEPA requires the agency to take a hard look at the impact of those actions. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 181 (4th Cir. 2005). NEPA compliance is required in the context of final agency action. *See Bennett*, 520 U.S. at 177-78 (final agency action is one which marks the consummation of the agency's decision making process and one by which rights and obligations are determined and "from which legal consequences will flow"). NEPA does not mandate any substantive results, but rather prescribes procedures which agencies must follow. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996).

Plaintiffs allege that defendants are required to complete an environmental assessment of their revisions to their previous interpretations of the red wolf rules. While defendants, in compliance with NEPA, prepared an environmental assessment prior to issuance of the final red

12

wolf rule, plaintiffs contend that the Service's change in policy implementation is sufficiently significant to require it to undergo further NEPA analysis. For the reasons discussed above, the Court finds that defendants' changes to their policy interpretation are likely to have a significant effect on the red wolf population, and as defendants have failed to conduct any assessment of its policy changes plaintiffs' are likely to succeed on their NEPA claim. *See, e.g., Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008) (an action having adverse effects on an endangered or threatened species may properly be considered significant action triggering NEPA requirements); *Hughes River Watershed Conservancy*, 81 F.3d at 443 ("NEPA requires agencies to take a hard look at the environmental consequences of their proposed projects even after an EIS has been prepared.").

B.  *Irreparable harm*

Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction. Environmental and aesthetic injuries by their nature are not adequately remedied by money damages, have permanent or long-lasting effects, and are thus properly the subject of injunctive relief. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987); *see also Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society"). Plaintiffs' members have clearly demonstrated that a decrease in their ability to enjoy red wolves in the wild, the possibility of an increase in red wolf mortality, and the decline or extinction of the species would cause them to suffer irreparable harm. *See, e.g.*, Beeland Decl. ¶¶ 4, 22, 23, 24 [DE 32-29]; McCallister Decl. ¶¶ 2, 13-17 [DE 32-43].

Defendants respond that plaintiffs cannot demonstrate irreparable harm because the Service has no current plans or intention to authorize the take of red wolves from private land

13

except as necessary to protect humans or livestock, and agrees to provide plaintiffs with ten days advanced notice prior to issuing a take or removal authorization for a wolf on private land. Such assurances are insufficient to moot the necessity of a preliminary injunction in this instance. "[A]n injunction is unnecessary when 'there is *no* reasonable expectation that the wrong will be repeated.'" *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). Defendants' statement, without more, that they will not engage in the conduct which plaintiffs seek to enjoin does not remove the possibility of recurrence, and, instead, only increases the likelihood of plaintiffs returning to this Court seeking emergency injunctive relief. *See United States v. Fang*, 937 F. Supp. 1186, 1200 (D. Md. 1996) ("mere declaration by a defendant that a challenged activity will cease, particularly when the filing of the injunction suit precipitated the declaration, does not preclude issuance of the injunction.").

C. *Balance of equities & public interest*

When the government opposes injunctive relief, the final two factors to be considered merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of equities and public interest plainly weigh in favor of issuing the preliminary injunction requested by plaintiffs. Indeed, "[t]he equitable scales are always tipped in favor of the endangered or threatened species," *Alliance for the Wild Rockies v. Krueger*, 950 F. Supp.2d 1196, 1200 (D. Mont. 2013), and the "balance of hardships and the public interest tips heavily in favor of protected species." *Nat. Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1510 (9th Cir.1994).

Further, plaintiffs' requested injunction is narrowly tailored – affecting only defendants' authorization of the take of non-problem red wolves – and thus does not operate to impose any great burden on the Service or more than minimally impact the Service and its work in this area.

The Court is mindful that the reintroduction of a top predator species will not be without challenges. However, as this Court has previously stated, it is without the authority to ignore Congress' clear mandate to prevent the extinction of the red wolf and reintroduce the species in the wild, and it is not for this Court to permit action or inaction which would have an effect counter to Congress' goals. *Red Wolf Coal.*, 2014 WL 1922234, at *8. Unless and until the Service terminates the red wolf recovery program and ceases its efforts in eastern North Carolina to restore this protected species in the wild, the public interest and equities of this case must weigh against the irreparable harm which would be caused by takes that are permitted because competing interests were more vocal or more effective, as failing to so find would fly in the face of "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth.*, 437 U.S. at 180.

D.  *Security*

Rule 65(c) of the Federal Rules of Civil Procedure requires the Court to consider whether plaintiffs should provide security in an amount sufficient to pay the costs and damages sustained by any party found to have been wrongfully enjoined. Where circumstances warrant it, a nominal bond may suffice. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). The Court finds such circumstance to exist here where plaintiffs are public interest groups who might otherwise be barred from obtaining meaningful judicial review were the bond required more than nominal. *See Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971). Accordingly, the Court finds that a $100 security will be sufficient.

## CONCLUSION

For the foregoing reasons, defendants' motion to limit the scope and standard of review [DE 29] is GRANTED IN PART and DENIED IN PART. The parties are DIRECTED to confer

and submit an amended joint Rule 26(f) report in light of the Court's ruling on the scope and standard of review not later than October 14, 2016.

Plaintiffs' motion for preliminary injunction [DE 31] is GRANTED. Defendants are hereby PRELIMINARILY ENJOINED from taking red wolves, either directly or by landowner authorization, pursuant to 50 C.F.R. §§ 17.84 (c)(4)(v) and (c)(10) without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets. Plaintiffs are ordered to post a security in the amount of $100 not later than October 5, 2016.

SO ORDERED, this 28 day of September, 2016.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE