IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:15-cv-00042-BO

| | |
|---|---|
| RED WOLF COALITION, DEFENDERS OF WILDLIFE, AND ANIMAL WELFARE INSTITUTE, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE UNITED STATES FISH AND WILDLIFE SERVICE; JIM KURTH, in his official capacity as Acting Director of the United States Fish and Wildlife Service; MIKE OETKER, in his official capacity as Acting Regional Director of the United States Fish and Wildlife Service Southeast Region.[1] | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS**

**STATEMENT OF FACTS**

1.      The red wolf (*Canis rufus*) has been pushed to the edge of extinction.  Once

common throughout the eastern and south-central United States, most red wolf populations were

destroyed by the early 20th Century as a result of intensive predator control programs and the

degradation and alteration of habitat.  Today, the red wolf is one of the most endangered species

in the world.  [DE 40 ¶ 70]; see also [DE 37 ¶ 70].

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jim Kurth, Acting Director of the U.S. Fish and Wildlife Service, is substituted for Daniel M. Ashe, former Director, and Mike Oetker, Acting Regional Director of the U.S. Fish and Wildlife Service Southeast Region, is substituted for Cynthia Dohner, former Regional Director.

2. The red wolf was first designated an endangered species in 1967 under the Endangered Species Preservation Act of 1966, the precursor to the federal ESA, 16 U.S.C. § 1531 et seq. [DE 40 ¶ 72]; see also [DE 37 ¶ 72].

3. By 1975, the U.S. Fish and Wildlife Service ("USFWS") determined that the only way to save the red wolf from extinction was to remove all red wolves from the wild and institute a captive-breeding program. More than 400 canids were captured by USFWS, but only 17 were identified as pure red wolves. Fourteen of these wolves became the founding members of the captive-breeding program and the ancestors of all red wolves living today. [DE 40 ¶ 73]; see also [DE 37 ¶ 73].

4. USFWS declared the red wolf extinct in the wild in 1980. [DE 40 ¶ 74]; see also [DE 37 ¶ 74].

**THE SERVICE'S SUCCESSFUL RED WOLF REINTRODUCTION**

5. In 1986, The Service issued a special rule under ESA Section 10 to establish the reintroduction of red wolves in Alligator River ("red wolf rule"). See generally Pls. App. 281 (Endangered and Threatened Wildlife and Plants; Determination of Experimental Population Status for an Introduced Population of Red Wolves in North Carolina, Final Rule, 51 Fed. Reg. 41,790 (Nov. 19, 1986) (to be codified at 50 C.F.R. Pt. 17)).

6. The Service completed an Environmental Assessment ("EA") when it first promulgated the red wolf rule in 1986. 51 Fed. Reg. at 41,796. [DE 40 ¶ 68]; see also [DE 37 ¶ 68].

7. In 1987, four pairs of red wolves bred in captivity were released into the Alligator River National Wildlife Refuge in eastern North Carolina as an experimental population under

Section 10(j) of the ESA, 16 U.S.C. § 1539(j).  The North Carolina red wolves constitute the only wild population of red wolves in the world. [DE 40 ¶ 75]; see also [DE 37 ¶ 75].

8.      The red wolf rule, 50 C.F.R. § 17.84(c), designates the "Alligator River reintroduction site" as being located in Dare, Hyde, Tyrrell, and Washington Counties, and further includes Beaufort County as part of the experimental population designation due to "its proximity and potential conservation value." Pls. App. 292 (50 C.F.R. § 17.84(c)(9)(i)). This area is often referred to as the "Red Wolf Recovery Area."  E.g. Pls. App. 297 (Red Wolf Recovery Program FAQs); Pls. App. 301 (3rd Quarter Report, Apr. – June 2011); Pls. App. 309-10 (2nd Quarter Report, Jan. – Mar. 2012).

9.      The Red Wolf Recovery Area encompasses approximately 1.7 million acres and contains four national wildlife refuges-- Alligator River National Wildlife Refuge, Pocosin Lakes National Wildlife Refuge, Mattamuskeet National Wildlife Refuge, and Swanquarter National Wildlife Refuge—the U.S. Air Force's Dare County Bombing Range, state-owned lands, and private lands. [DE 40 ¶ 77]; see also [DE 37 ¶ 77].

10.     The expansion to include additional national wildlife refuges near Alligator River "was a logical decision based on the success of the reintroduction to that point of time" and because national wildlife refuges "are mandated to conserve and recover endangered species." Pls. App. 322 (Endangered and Threatened Wildlife and Plants; Revision of the Special Rule for Nonessential Experimental Populations of Red Wolves in North Carolina and Tennessee 60 Fed. Reg. 18,940, 18,945 (Apr. 13, 1995) (to be codified at 50 C.F.R. Pt. 17)).

11.     At its inception, the red wolf recovery program was managed by the National Wildlife Refuge program within USFWS.  Pls. App. 261 (Benjamin II Depo 227:18-228:23).

12.     The Red Wolf Recovery Program is co-located with the Alligator National Wildlife Refuge office in Manteo, North Carolina.  Pls. App. 187 (Miranda Depo 61:18-25).

13.     The red wolf rule was revised in 1991 and again in 1995, with the 1995 revision representing the current version of the red wolf rule. Pls. App. 317 (60 Fed. Reg. at 18,940).

14.     The Service completed an EA with its current, 1995 revision of the red wolf rule. [DE 40 ¶ 68]; see also [DE 37 ¶ 68].

15.     The red wolf rule allows private landowners to take wolves including by lethal means "after efforts by project personnel to capture such animals have been abandoned, Provided that the Service project leader or biologist has approved such actions in writing and all such taking shall be reported within 24 hours." Pls. App. 291 (50 C.F.R. § 17.84(c)(4)(v)).

16.     The red wolf rule also allows the Service to recapture if possible: "any animal . . . that moves onto lands where the landowner requests their removal will be recaptured, if possible, by Service and/or Park Service and/or designated State wildlife agency personnel and will be given appropriate care." Pls. App. 292 (50 C.F.R. § 17.84(c)(10)).

17.     If a red wolf is removed in response to a landowner request pursuant to the red wolf rule, the wolf must "be released into the wild as soon as possible unless physical or behavioral problems make it necessary to return the animals to a captive-breeding facility." Pls. App. 292 (50 C.F.R. § 17.84(c)(10)).

18.     The preamble to the 1995 rule revision, clarifies "[i]t is highly objectionable to owners of livestock and pets to be unable to kill a predator that is engaged in killing their livestock or pets."  Pls. App. 320 (60 Fed. Reg at 18,943).  Thus, landowners may take wolves in these circumstances.  Where a landowner requests a written take authorization, the determination of "when Service or State attempts to recapture the animal are deemed unsuccessful and the

private landowner is then permitted to take the offending animals… must be made by the Service project leader or biologist in the field at the depredation location." Id.

19.     Throughout the history of the red wolf recovery program, there have been only six confirmed depredation events that have involved red wolves. Pls. App. 328 (Summary of July 15, 2014 Meeting with Owners of Mattamuskeet Ventures LLC); Pls. App. 142-45 (Beyer Depo 183:19-186:23); Pls. App. 272-74 (Vucetich Depo 345:14-347:09).

20.     The population of wild red wolves successfully grew to 100 individuals in the late 1990's. [DE 40 ¶ 79]; see also [DE 37 ¶ 79].

21.     The 5-year experiment to reestablish a population of red wolves in northeastern North Carolina ended October 1, 1992, and "[b]y almost every measure, the reintroduction experiment was successful and generated benefits that extended beyond the immediate preservation of red wolves to positively affect local citizens and communities, larger conservation efforts, and other imperiled species."  Pls. App. 318 (60 Fed. Reg. at 18,941).

22.     The goal of the red wolf recovery program is "recovery of the species in the wild."  Pls. App. 64 (Beyer Depo 63:09-13); Pls. App. 229 (Benjamin I Depo 105:05-16). Releases of captive wolves and sterilization of coyotes were management actions undertaken to contribute to the goal of recovery of red wolves in the wild.  Pls. App. 65, 67, 165 (Beyer Depo 64:15-18, 66:14-20, 266:13-226:25).

23.     By 1990, captive-born red wolves released into the red wolf recovery area were reproducing in the wild.  Pls. App. 338 (1990 Red Wolf Recovery Plan).

24.     Wild-born red wolves contribute to recovery of the wild red wolf population because they have different behaviors or experiences than captive red wolves.  Pls. App. 166-67

5

(Beyer Depo 274:06-275:11); Pls. App. 241 (Benjamin I Depo 248:07-19); Pls. App. 275-76 (Vucetich Depo 363:13-364:09).

***Red Wolf Releases into the Wild***

25.     Between 1987 and 1992, 42 wolves were released in the Recovery Area.  Pls. App. 317 (60 Fed. Reg. at 18,940); Pls. App. 450 (<u>Gibbs v. Babbitt</u>, 214 F.3d 483, 488 (4th Cir. 2000)).

26.     From September 1987 through April 2014, a total of 134 red wolves were released into the Red Wolf Recovery Area, including 42 adults, 22 juveniles, and 70 pups. Ninety of these were captive-born red wolves, forty were born on island propagation sites, and four were transferred from the Great Smokey Mountains National Park reintroduction site. Red wolves "were released as mated breeding pairs, sibling groups, family groups, or foster pups." Pls. App. 469 (2015 Biological Opinion).

27.     The 2007 Status Review stated that "[d]uring the past five years, pup fostering has developed as a significant and useful population management tool in red wolf recovery."  Pls. App. 510 (2007 5-Year Status Review); Pls. App. 15 (Harrison Depo 72:01-10). Pup-fostering "involves placing captive-born pups less than two weeks old into the den of wild red wolf parents."  Pls. App. 510 (2007 5-Year Status Review).

28.     A total of 11 red wolf pups were released from the captive breeding program and an island propagation site into the wild red wolf population between 2002 and 2007."  Pls. App. 510 (2007 5-Year Status Review).

29.     According to a July 2002 red wolf newsletter, available on the USFWS Red Wolf Recovery Program website (https://www.fws.gov/redwolf/archives.html) as of March 12, 2018, the Service "implemented the first fostering of captive born red wolf puppies from a zoo into a

6

wild red wolf litter," in May 2002 with two red wolf pups from the North Carolina Zoological Park. Pls. App. 550. According to a Spring 2004 newsletter available on the USFWS Red Wolf Recovery Program website as of March 12, 2018, the wild red wolf mother accepted the two foster pups. Pls. App. 551.

30. According to a November 2002 newsletter available on the USFWS Red Wolf Recovery Program website (https://www.fws.gov/redwolf/archives.html) as of March 12, 2018, two wolves from an island propagation site were transferred to Alligator River in September 2002 to be released into the wild population later that fall. Pls. App. 553-54.

31. According to a Summer 2004 newsletter available on the USFWS Red Wolf Recovery Program website (https://www.fws.gov/redwolf/archives.html) as of March 12, 2018, in spring of 2004, two more red wolf puppies were added to the wild population via pup-fostering. Pls. App. 555.

32. According to a Summer 2007 newsletter available on the USFWS Red Wolf Recovery Program website (https://www.fws.gov/redwolf/archives.html) as of March 12, 2018, four pups from the captive breeding program were released into the wild population in 2006 via a single pup-fostering event with one wild red wolf pack. Pls. App. 558. This newsletter also reported that in 2007, three pups from the captive breeding program were released into the wild population via two pup-fostering events with two different red wolf packs. Id.

33. According to a Summer 2009 newsletter available on the USFWS Red Wolf Recovery Program website (https://www.fws.gov/redwolf/archives.html) as of March 12, 2018, In 2009, four pups from the captive breeding program were released into the wild population via two pup-fostering events with two different red wolf packs. Pls. App. 561; Pls. App. 569-70 (1st Quarter Report, Oct. – Dec. 2009). The newsletter also reported that four male red wolves and

one female red wolf were transferred from St. Vincent National Wildlife Refuge to the wild population in North Carolina.  Pls. App. 561

34.    In 2010, two pups from the captive breeding program were released into the wild population via a single pup-fostering event with one red wolf pack.  Pls. App. 577 (3rd Quarter Report, Apr. – June 2010).

35.    In 2011, two pups from the captive breeding program were released into the wild red wolf population via pup-fostering.  Pls. App. 302 (3rd Quarter Report, Apr. – June 2011).

36.    In 2012, two captive-born pups were released into the wild red wolf population via pup-fostering.  Pls. App. 588 (3rd Quarter Report, Apr. – June 2012).

37.    In 2013, a captive-born pup was released into the wild red wolf population via pup-fostering.  Pls. App. 596 (3rd Quarter Report, Apr. – June 2013).

### Addressing Hybridization with Coyotes

38.    In the late 1990s, increased numbers of coyotes in the RWRA led to increasing concerns of red wolf-coyote hybridization, threatening the future of the wild red wolf population.  Pls. App. 604 (Stoskopf et al.  *From the Field: Implementing Recovery of the Red Wolf— Integrating Research Scientists and Managers*, 1151 (2005)); Pls. App. 613 (Gese et al. *Managing Hybridization of a Recovering Endangered Species: The Red Wolf Canis Rufus as a Case Study*, 61 Current Zoology 191 (2015)), Pls. App. 634 (1999 Population and Habitat Viability Assessment).

39.    On November 23, 1998, Brian Kelly, the Red Wolf Field Projects Coordinator, explained in a memorandum that hybridization was one of the leading threats to recovery the red wolf, and that removing red wolves that are not causing a problem from private lands "have an unknown effect on aiding coyote colonization and hybridization." Pls. App. 720 (Memorandum re Requests to Remove Non-Problem Wolves from Private Land (Nov. 23, 1998)).

8

40.     A meeting was held between Service and Solicitor Office staff on January 21, 1999 in Manteo to evaluate the red wolf rule and problems arising for the Red Wolf Recovery Program in implementing the rule. Pls. App. 724 (Red Wolf Regulations Paper). The meeting concluded with a decision to implement an unwritten policy to not remove wolves or issue take authorizations in the absence of the wolf causing a problem. Pls. App. 729; Pls. App. 730 (Jackson Briefing Statement (Feb. 23, 1999)).

41.     On January 28, 1999, Brian Kelly, the Red Wolf Field Coordinator, sent a memorandum and guidelines document to John Ebersole, a Department of Interior Solicitor, V. Gary Henry, the Red Wolf Recovery Coordinator, and Jack Baker, a USFWS Special Agent. Pls. App. 721. As explained in the memorandum, the red wolf field crew was to begin following the enclosed guidelines in responding to requests for written take authorization and requests for removal of red wolves from private lands. Id. The Memorandum and Guidelines were also transmitted to Mike Bryant, Refuge Manager for Alligator River National Wildlife Refuge. Id.

42.     The guidelines, entitled "Guidelines For Applying the Current Red Wolf Rule (April 13, 1995) to Requests to Remove Red Wolves From Private Land," (hereinafter "1999 Guidelines") were effective January 28, 1999 and clarified that "problem" and "non-problem" wolves would be treated differently. Pls. App. 723.

43.     The 1999 Guidelines define "wolves that are causing a problem" as "[a]ny situation where the loss of personal property (e.g. livestock, pets) is directly caused by the actions of a red wolf," or "[a] wolf exhibiting inappropriate behavior, such as tolerance of people or dwellings, that suggests it may become a more serious problem." Pls. App. 723.

44.     Under such circumstances, the Guidelines provide that "field personnel will respond within 48 hours," and "if a wolf is indeed responsible for the reported problem," "the

capture and removal of the offending animal, or the application of some behavioral modification technique, may be attempted. If capture is not successful or feasible, lethal means could be employed or written permission may be provided according to the specifications provided in the current red wolf rule." Pls. App. 723.

45.     The 1999 Guidelines provide that in situations involving non-problem wolves, "field crew will respond, if manpower permits, to the landowner's request, to assess the situation and determine if efforts to capture such wolves are warranted." Pls. App. 723. The Guidelines explain that "removal of non-problem wolves may be contributing to the establishment of coyotes in north eastern NC and thus such removals may have a detrimental effect on red wolf recovery efforts by increasing the threat of hybridization." Id.

46.     A February 5, 1999 memorandum from Brian Kelly indicates that he also sent the Guidelines to the refuge managers for Pocosin Lakes NWR and Mattamuskeet NWR, explaining that the enclosed guidelines were "for applying the current red wolf rule" and "are a result of our January meeting and have been crafted in close collaboration with John Ebersole our ES Solicitor." Pls. App. 722. Brian Kelly also explained that "[w]e have applied these guidelines and removed traps from a farm we were trapping to remove non-problem wolves." Id. The memo also referenced that "Gary is preparing a briefing statement on these guidelines for the regional office." Id.

47.     A February 23, 1999 memorandum from Gerry Jackson, Assistant Director for Ecological Services with the USFWS, explained that "[a] meeting of Service and Solicitor Office personnel regarding the current red wolf regulations concluded with a consensus that interpretation of the current regulations provides the flexibility to deny requests for removing red wolves from private lands in the absence of a problem." Pls. App. 730. The memorandum

Case 2:15-cv-00042-BO   Document 80   Filed 03/12/18   Page 10 of 47

reiterated that "In cooperation with the Regional Solicitor's Office, we have developed written guidelines for implementing the regulations." Pls. App. 731.

48. The memorandum explained that "[t]his interpretation of the regulations is also in tune with traditional wildlife management concepts and laws. Wildlife are not the property of landowners but belong to the public and are managed by Federal and State governments for the public good. Such concepts and laws do not provide for taking or removal of wildlife from private lands in the absence of a problem." Pls. App. 730.

49. The memorandum continued to explain the justifications for the Guidelines:

[R]emoval of wolves in the absence of a problem may be detrimental to the conservation of the species by preventing natural expansion and recovery of the species, and by contributing to the establishment of coyotes. This may result in interbreeding between the two species. Interbreeding with coyotes was the final factor that led to endangerment and near extinction of the species.

Pls. App. 731.

50. Removing red wolves from private lands, holding them in captivity, and releasing them away from their previous home ranges could contribute to hybridization events with coyotes, add stress to the removed animal, and disrupt breeding and pack dynamics. Pls. App. (Beyer Depo 243:03-246:07); Pls. App. 746-58 (Vucetich Expert Rep.).

51. Removing red wolves from private lands and holding them in captivity can cause the wolves to become too habituated to humans. Pls. App. 238-40 (Benjamin I Depo 172:02-174:15). Determining how long to hold a red wolf in captivity "is really a judgment by the biologist of what is appropriate. They have a much better sense for the individual behavior of these animals . . . ." Pls. App. 239-40 (Benjamin I Depo 173:23-174:01).

52.     Current Raleigh Field Office Supervisor Pete Benjamin explained his understanding of the Guidelines as "a statement of what we intended to do from that point forward." Pls. App. 262 (Benjamin II Depo 230:07-14).

53.     In an e-mail, Assistant Regional Director Leo Miranda clarified his understanding that implementing an unwritten policy to not remove wolves or issue take authorizations in the absence of a problem was Service policy until 2014. Pls. App. 765 (E-mail from Harrison to Miranda (July 24, 2014)); Pls. App. 766 (E-mail from Miranda to Harrison (July 24, 2014)); see also. [DE 32-15].

54.     In April 1999, a Population Habitat and Viability Assessment workshop was convened with 40 experts in the fields of wolf biology, coyote biology, wildlife biology generally, genetics, captive breeding, and population modeling. Pls. App. 634. The workshop focused on hybridization as the primary threat to the wild red wolf population's viability. Id; Pls. App. 774 (Benjamin Rebuttal Expert Rep.).

55.     The Service first implemented an adaptive management program as an integral part of the red wolf recovery program in 1999 to control hybridization through interbreeding with coyotes, the leading threat to the species. [DE 40 ¶ 78]; see also [DE 37 ¶ 78]; Pls. App. 774 (Benjamin Rebuttal Expert Rep.); Pls. App. 222 (Benjamin I Depo 81:05-14); see generally Pls. App. 791 (Red Wolf Recovery Program Adaptive Work Plan FY00-FY02).

56.     In 2000, Brian T. Kelly, Coordinator of Field Projects for the Red Wolf Recovery Program, prepared a Red Wolf Recovery Program Adaptive Work Plan which specified "the . . . implementation strategy of an adaptive management plan" including the goal of "insur[ing] that all known breeding units are red wolf." Pls. App. 792, 796 (Red Wolf Recovery Program Adaptive Work Plan FY00-FY02).

57.     The red wolf adaptive management program implemented techniques to

sterilize hormonally intact coyotes and hybrids via vasectomy and tubal ligation,
then use them as territorial "place-holders" until replaced by wild red wolves.
"Placeholder" canids will not interbreed with wild red wolves, and they exclude
other coyotes or hybrids from the territory they hold. Ultimately, the "place-
holder" canids are replaced by red wolves either naturally (e.g. displacement) or
via management actions (e.g., removal followed by pairing wild or translocated
wolves into the territory).

Pls. App. 500 (2007 5-Year Status Review); see also Pls. App. 611 (Gese et al. 2015).

58.     The 1999 PHVA meeting resulted in the development of the RWAMP as well as a

Red Wolf Recovery Implementation Team" to advise USFWS as they implemented the adaptive

management plan.  The eight-member team was comprised of scientists with different areas of

expertise committed to using a data-driven approach who recognized the red wolf field team as

the "most experienced red wolf biologists and essential for successful functioning of the RWIT

itself."  Pls. App. 606 (Stoskopf et al. 2005).

59.     The 2000 Red Wolf Recovery Program Adaptive Work Plan was revised in

March 2005 by Red Wolf Recovery Program Team Leader Bud Fazio, Wildlife Biologist Chris

Lucash, and Wildlife Biologist Art Beyer. See Pls. App. 808 (Red Wolf Recovery Program

Adaptive Work Plan (2005)). This revision listed the goals of the RWAMP as "(1) reduce

interbreeding between red wolves and coyotes to a level that does not threaten the long term

genetic integrity of the red wolf in the wild while simultaneously (2) building and maintaining

the wild red wolf population from the east to west of the NENC recovery area."  Pls. App. 811

60.     In 2007, the U.S. Fish and Wildlife Service issued a five-year status review on the

red wolf.  Pls. App. 491 (2007 5-Year Status Review).

61.   The 2007 Status Review stated declared the Red Wolf Adaptive Management Plan a success in "reducing introgression of coyote genes and reducing the number of coyotes in the red wolf NEP area."  Pls. App. 521 (2007 5-Year Status Review).

62.   The 2007 Status Review explained that under the Red Wolf Adaptive Management Plan, "[c]aptured coyotes are sterilized and returned to a territory to hold space until replaced by red wolves over time.  If there is no space available for a sterilized coyote, we euthanize at the request of the landowner." Pls. App. 522.

63.   The RWAMP was again revised in 2010 by Red Wolf Recovery Program Coordinator David Rabon and Wildlife Biologist Art Beyer. Pls. App. 815 (Red Wolf Adaptive Management Plan FY10-FY12). This revision contained the same goals as the 2005 revision regarding reducing interbreeding between red wolves and coyotes and building and maintaining the wild red wolf population. Pls. App. 820.

64.   In 2010, the Red Wolf Quarterly Reports documented two coyote sterilization events.  Pls. App. 831, 833 (2nd Quarter Report, Jan. – Mar. 2010); Pls. App. 578 (3rd Quarter Report, Apr. – June 2010).

65.   During October – December 2011, seven coyotes were sterilized and radio collared.  Pls. App. 840 (1st Quarter Report, Oct. – Dec. 2011) (revised).

66.   During January through March 2012, 20 coyotes were sterilized and radio-collared. Pls. App. 310 (2nd Quarter Report, Jan. – Mar. 2012).

67.   During April through June 2012, two coyotes were sterilized and radio-collared. Pls. App. 588 (3rd Quarter Report, Apr. – June 2012).

68.   The RWAMP was again revised in 2013 by Red Wolf Recovery Program Coordinator David Rabon, Assistant Coordinator Rebecca Bartel, and Field Coordinator Art

Beyer. Pls. App. 846 (Red Wolf Adaptive Management Plan FY13-FY15). This revision contained the same goals as the 2005 revision regarding reducing interbreeding between red wolves and coyotes and building and maintaining the wild red wolf population.  Pls. App. 851.

69.    During January through March 2013, 29 coyotes were sterilized and radio-collared. Pls. App. 862 (2nd Quarter Report, Jan. – Mar. 2013).

70.    During April through June 2013, five coyotes were sterilized and radio-collared. Pls. App. 596 (3rd Quarter Report, Apr. – June 2013).

71.    During October through December 2013, five coyotes were sterilized and radio-collared.  Pls. App. 870 (1st Quarter Report, Oct. – Dec. 2013).

72.    During January through March 2014, 14 coyotes were sterilized and radio-collared.  Pls. App. 879 (2nd Quarter Report, Jan. – Mar. 2014).

73.    According to Defendants' rebuttal expert Pete Benjamin, red wolves require "management activities identified in the RWAMP (e.g. use of placeholders, active removal of hybrids, and management of interspecific pairings) as well as the active management of human-related mortality.  Discontinuation of these management practices to address these threats leads to a decline in the population."  Pls. App. 779 (Benjamin Rebuttal Expert Rep.).

74.    The RWAMP was successful at reducing hybridization and assisting expansion of the red wolf population.  Pls. App. 500-1, 523 (2007 5-Year Status Review); see Pls. App. 611 (Gese et al. 2015); Pls. App. 775 (Benjamin Rebuttal Expert Rep.); Pls. App. 742-43 (Vucetich Expert Rep.).

75.    By reducing the rate of hybridization, sterilization activities were successful at limiting hybrid litters to only a few each year.  Pls. App. 894 (Gese & Terletzky, *Using the "placeholder" concept to reduce genetic introgression of an endangered carnivore*, Biological

Conservation (2015)).  Accordingly, the genetic composition of the red wolf population in 2014 contained less than 4% coyote introgression. Id.

76.    Field Supervisor Pete Benjamin stated "The RWAMP worked" and "[g]enetic introgression from the growing coyote population into the red wolf population was reduced." Pls. App. 775 (Benjamin Rebuttal Expert Rep.).

77.    Preventing hybridization between red wolves and coyotes helped to achieve the goal of recovery of the red wolf in the wild. Pls. App. 110 (Beyer Depo 138:07-10).

78.    A 2005 scientific review of the Red Wolf Recovery Program declared "[w]e believe the recent tangible success in red wolf recovery is a direct result of conducting the PHVA, crafting a RWAMP, establishing the RWRIT, and the cooperation and close interaction between the RWRIT and the USFWS field team directly tasked with red wolf recovery." Pls. App. 609 (Stoskopf et al. 2005); see also Pls. App. 611 (Gese et al. 2015).

79.    In 2007, the USFWS stated that "efforts to restore, recover and conserve [red wolves] have been remarkably successful," characterizing the wild red wolf population as "restored" with "up to nearly 130" animals.  Pls. App. 523 (2007 5-Year Status Review).

80.    According to former Assistant Recovery Coordinator Rebecca Harrison, the red wolf recovery program "was successful for the duration of the program, at least from a biological perspective.  Animals were producing in the wild right away, the population was growing, et cetera." Pls. App. 41 (Harrison Depo 187:10-14).

81.    From 2002 to 2014, the wild population of red wolves was always estimated at 100 or more individuals. Pls. App. 896 (Red Wolf Demographics Charts); [DE 32-8].

82.     The success of the red wolf reintroduction caused it to serve as a model for reintroduction efforts for other species across the country. [DE 40 ¶ 81]; see also [DE 37 ¶ 81]; Pls. App. 16-17, 13-15 (Harrison Depo 74:18-75:07; 69:20-70:02).

## THE SERVICE'S SHIFT IN MANAGEMENT

83.     Leo Miranda first began working as the Assistant Regional Director in the Southeast Ecological Services office in Atlanta in 2011. Pls. App. 178-79 (Miranda Depo 26:25-27:12); Miranda Decl. ¶1, ECF No. 68-6.

84.     Jett Ferebee owns a parcel of land in the Red Wolf Recovery Area known as Bee Tree Farms, which borders Pocosin Lakes National Wildlife Refuge. Pls. App. 192-93 (Miranda Depo 85:22-86:02); Pls. App. 146 (Beyer Depo 202:18-20). Mr. Ferebee does not live on his property in the Red Wolf Recovery Area.  Pls. App. 205 (Miranda Depo 166:10-13).

85.     Leopoldo Miranda first interacted with landowner Jett Ferebee on April 19, 2013, when responding to an April 18, 2013 e-mail from Jett Ferebee to Red Wolf Recovery Coordinator David Rabon regarding a request for removal of red wolves. Pls. App. 909-11 (E-mail chain between [Redacted Name] and Miranda et al. (Apr. 18-19, 2013)). In that e-mail, Mr. Miranda introduced himself as the Assistant Regional Director for Ecological Services and stated "I am responsible for the implementation and management of the Endangered Species Act and the Red Wolf Recovery Program." Pls. App. 909-10 (E-mail from Miranda to [Redacted Name] (Apr. 19, 2013)); Pls. App. 203 (Miranda Depo 154:01-15).  Mr. Ferebee has since contacted Mr. Miranda "multiple times" with requests to remove red wolves from his property and requests for take authorizations for red wolves on his property.  Pls. App. 204 (Miranda Depo 155:02-17).

86.     In his role as Assistant Regional Director for Ecological Services, Mr. Miranda supervises Ecological Services for 10 states, Puerto Rico and the U.S. Virgin Islands, one of the

largest USFWS regions. Pls. App. 180 (Miranda Depo 28:1-6; 28:11-14). This includes, among other duties, managing all projects under the Endangered Species Act, policy, budgets, personnel, non-ESA environmental compliance and all field offices in this region. Pls. App. 181 (Miranda Depo 33:3-21). He undertakes these duties from Atlanta, Georgia. Pls. App. 178 (Miranda Depo 26:25-27:12); see also [DE 68-6].

87.    In an April 23, 2013 e-mail, Janet Mizzi, Chief of Division of Endangered Species for USFWS Region 4, explained to Leopoldo Miranda that "[s]hortly after the rule was published, we recognized several potential issues that conflict with our ability to recover the red wolf," and "[a]s such, we developed specific guidelines (policy dated January 28, 1999) to address requests to remove red wolves from private lands." Pls. App. 906-7. Ms. Mizzi then recommended how to respond to a landowner's request for removal of wolves, stating that "[m]y understanding is that [Mr. Ferebee] has not provided any evidence of predation, which is required by the rule." Pls. App. 907.

88.    Also on April 24, 2013, Red Wolf Recovery Program Coordinator David Rabon, explained to Mr. Miranda in an e-mail that the 1999 Guidelines "sufficed in responding to requests to remove wolves until Mr. [redacted name] began his requests around 2008." Pls. App. 906.

89.    On April 26, 2013, Field Coordinator Art Beyer reported that "3 litters came back hybrid," including "Tyson (bee tree)," expressing frustration that "[m]aybe that's what happens when we catch a breeding male (at bee tree) during breeding season and release further away due to circumstances with a [expletive] landowner." Pls. App. 912 (E-mail chain between Beyer and Rabon et al. (April 26, 2013)). In response, Red Wolf Recovery Coordinator David Rabon

informed Mr. Beyer that he intended "to give all of these updates to the RO to let them know what kind of issues this level of mortality and landowner issues are creating." Id.

90.     On June 20, 2013, Mr. Miranda recommended "drafting a response to Mr. Ferebee with the history of what we have done til' today since my meeting with him in Raleigh and since we started trapping these wolves.  Let's document that we have done all we could.  Then add a 'therefore' and use our rule's language to authorize him to take the wolf." Pls. App. 916 (E-mail from Miranda to Rabon (June 20, 2013)).

91.     In an e-mail response to Mr. Miranda, David Rabon stated "I'm trying to understand our long-term, short-term objectives with this issue," and explained "that we haven't necessarily 'done all we could' if the alternative is to authorize Mr. Ferebee to kill the remaining wolf."  Pls. App. 914 (E-mail from Rabon to Miranda (June 20, 2013)).  Mr. Rabon explained how two wolves had already been captured from Mr. Ferebee's property "and have continued to hold them in captivity for about four weeks now," but that seasonal weather was preventing USFWS from being able to attempt to trap for a third wolf "that used a portion of his property as part of their territory." Id.  Mr. Rabon further expressed concern that a lethal take authorization "could negatively affect a number of wolf packs in the area, and, more importantly, greatly affect our abilities to conserve the red wolf.  My concern is that we are at a point where our decisions are no longer just trying to appease on uncooperative landowner, but rather have the potential to change the course of this program away from its mission to recover the red wolf." Id.

92.     In a June 24, 2013 memo to Red Wolf Recovery Program Coordinator David Rabon, Red Wolf Recovery Program Field Coordinator Art Beyer explained that "two female wolves captured in May have been held for a month now, much longer than we have held wolves

in the past following the capture of wolves in response to a presence-only complaint." Pls. App. 918-19. The memo stated an intent and plan to release one of the red wolves. Id.

93.    In December 2013, management of the Red Wolf Recovery Program was formally shifted to USFWS's Ecological Services Program, which has a separate and different chain of command from the National Wildlife Refuges program. Pls. App. 8, 39-40 (Harrison Depo 36:8-25; 174:22-175:17); Pls. App. 182-83 (Miranda Depo 56:24-57:17); Pls. App. 215 (Benjamin I Depo 32:06-17); Pls. App. 248-49 (Benjamin II Depo 86:20-87:02).

94.    Prior to the shift, the Red Wolf Recovery Program Staff were supervised by David Rabon, Red Wolf Recovery Program Lead, who in turn was supervised by Mike Bryant, Project Leader of the Refuge Complex at Alligator River. Pls. App. 215 (Benjamin I Depo 32:06-17); Pls. App. 8 (Harrison Depo 36:01-07); Pls. App. 183 (Miranda Depo 57:07-17).

95.    After the shift to Ecological Services, the Program was run through Pete Benjamin as the Field Supervisor for the USFWS Raleigh Office for Ecological Services, up to Leopoldo Miranda, the Assistant Regional Director of Ecological Services for Region 4 off USFWS, based in Atlanta. Pls. App. 8 (Rebecca Depo 36:8-25); Pls. App. 215 (Benjamin I Depo 32:06-17); Pls. App. 248-49 (Pete Depo II 86:20-87:02); Pls. App.  (Miranda Depo 56:24-57:17). The culture and practice of Ecological Services program differs from the National Wildlife Refuges program. Pls. App. 182-83 (Benjamin I Depo 42:18-43:17).

96.    Assistant Regional Director Leopoldo Miranda and National Wildlife Refuge System Regional Chief David Viker made the decision to move the Program from under the supervision of the National Wildlife Refuges program to the Ecological Services program for the purposes of "better coordination in terms of the management, in general – supervisory, in terms of the resource of the budget." Pls. App. 184-87 (Miranda Depo 58:23-61:14). When asked

what benefits had been experienced as a result of shifting the Program to Ecological Services, Mr. Miranda stated, "one of the biggest improvements is the more efficient way of sending funds, for example." Id.

97.     According to a Dec. 3, 2013 e-mail from David Rabon, Red Wolf Recovery Program Coordinator, to Leopoldo Miranda, Assistant Regional Director for Ecological Services, "[w]e have been using these Guidelines since then [1999] with a great deal of success." Pls. App. 920. The e-mail explained several documents "that show this issue was fully considered and resolved in 1999." Pls. App. 920-21.

98.     On Dec. 16 2013, Jett Ferebee again requested written authorization to remove or kill red wolves on his property. Pls. App. 930-33 (E-mail from Ferebee to Miranda (Dec. 16, 2013)).

99.     In response, David Rabon, Red Wolf Recovery Program Lead expressed concern about issuing a take authorization because USFWS staff had not evaluated what animals were on the property since Sept. 1, 2013, a take authorization would not be warranted if the animals in question were not in fact wolves, and constantly removing canids from the property would simply create space for new wolves to move into the territory. Pls. App. 928-30 (E-mail from Rabon to Miranda (Dec. 17, 2013)).

100.    Despite the stated concerns of Red Wolf Recovery Program staff, Assistant Regional Director Miranda stated that he believed the Service had no choice but to issue the take authorization in question and the Service "need[ed] to comply with what is written in the rule and issue the letter to him." Id. Pls. App. 928 (E-mail from Miranda to Rabon (Dec. 17, 2013)).

101.    The request was ultimately denied in a Dec. 23, 2013 letter signed by Assistant Regional Director Miranda because of insufficient evidence of wolves on the property, because

the solicitor's office did not think the take authorization was justified because of insufficient information, and because Service staff had not abandoned efforts to remove wolves from Mr. Ferebee's property. Pls. App. 934-35 (Letter from Miranda to Ferebee, Jr. (Dec. 24, 2013)); Pls. App. 936 (E-mail from Rabon to Bryant (Dec. 20, 2013)).

102. On Feb. 6, 2014, Assistant Regional Director Leopoldo Miranda issued the first lethal take authorization pursuant to 50 C.F.R. § 17.84(c)(4)(v) in the history of the red wolf recovery program to Jett Ferrebee. [DE 40 ¶ 92]; see also [DE 37 ¶ 92]; Pls. App. 938-39 (Letter from Miranda to Ferebee (Feb. 6, 2014)).

103. The February 6, 2014 take authorization was never acted upon by the landowner. [DE 40 ¶ 100]; see also [DE 37 ¶ 100].

104. Assistant Recovery Coordinator Rebecca Harrison expressed concerns about this take authorization prior to its issuance. Pls. App. 45-48 (Harrison Depo 197:16-200:09).

105. The Service had "not yet been able to confirm the identity, the total number of collared canids present on [Mr. Ferebee's] camera pictures, or the extent with which they [were] using [Mr. Ferebee's] property." Pls. App. 938 (Letter from Miranda to Ferebee (Feb. 6, 2014)).

106. Moreover, the Service could not confirm that an animal Mr. Ferebee reported to be on his property was a red wolf and the Service had not attempted to capture it. Pls. App. 39 (Letter from Miranda to Ferebee (Feb. 6, 2014)).

107. As memorialized in the Feb. 6, 2014 take authorization, the only two red wolves known to have used Mr. Ferebee's property since the December 23, 2014 had already been removed and were currently in a captive management facility. Id.

108. The Feb. 6, 2014, take authorization declared "we can state at this time given our other staffing commitments and lack of access to actively trap on the property that we are

foreclosed from pursuing the animal on your property and in that sense must abandon efforts to capture and relocate the animal ourselves." Id.

109.    On February 20, 2014, Leopoldo Miranda told Gary Frazer, Assistant Director of Ecological Services in USFWS, that the regional office was considering whether the red wolf population had any likelihood of success. Pls. App. 941 (E-mail from Frazer to Souza et al. (Feb. 20, 2014)).

110.    Up until sometime in 2013 or 2014, Field Coordinator Art Beyer had the authority to make the decision to release wolves that were being held in captivity after being removed from private lands. After 2013 or 2014, someone higher up in Mr. Beyer's supervisory chain made that decision. Pls. App. 152-53 (Beyer Depo 232:12-233:25).

111.    On July 8, 2014, Assistant Regional Director Leopoldo Miranda forwarded a landowner removal request to program staff. Field Coordinator Art Beyer responded that "I will wait to respond till we know how we are going to proceed," and explained "this will be very difficult logistically," noting that in some cases, "we have intact wolf packs with pups born late April that only use part of the requestor's property, and where we have permission or support on lands surrounding them." Pls. App. 943 (E-mail from Beyer to Miranda (July 8, 2014)).

112.    On August 29, 2014, the Service announced that it had commissioned a review of the red wolf recovery program by the Wildlife Management Institute. Pls. App. 945 (News Release, Tom McKenzie, Eastern North Carolina Red Wolf Population Under Review (Aug. 29, 2014)).

113.    Conservation groups objected to the WMI report, noting that the five-year status review required by the ESA should have been completed in 2012 and expressing concern that the

WMI review was provided for nowhere in the ESA. Pls. App. 947-48 (Letter from Weaver to Dohner (Sept. 2, 2014)).

114.    A five-year status review for the red wolf has not been completed since the 2007 Status Review. [DE 40 ¶¶ 26, 131, 132]; see also [DE 37 ¶¶ 26, 131, 132].

115.    In late summer of 2014, the Service began receiving hundreds of requests for removal of red wolves from private lands and requests for take authorizations. Pls. App. 949 (E-mail from Benjamin to Miranda et al. (Sept. 2, 2014)), Pls. App. 233 (Benjamin I Depo 124:16-22; Pls. App. 951 (E-mail from Beyer to Benjamin (Oct. 30, 2014)).

116.    Most of these were identical in language and format. Pls. App. 949 (E-mail from Benjamin to Miranda et al. (Sept. 2, 2014)).

117.    This influx of requests for removal was a result of an active campaign to encourage landowners to send requests for removal. Pls. App. 955-56 (E-mail from Beyer to Miranda (July 9, 2014)); Pls. App. 256-57 (Benjamin II Depo 128:15-129:10).

118.    In September 2014, Red Wolf Recovery Coordinator David Rabon's position was reassigned and he left the Service. Pls. App. 5-6 (Harrison Depo 33:25-34:08). That position was not filled and instead different staff, including Rebecca Harrison and Art Beyer, served as "acting" red wolf recovery coordinator.  Pls. App. 188-91 (Miranda Depo 67:22-70:04); Pls. App. 219-21 (Benjamin I Depo 58:14-60:06).

119.    On September 23, 2014, Raleigh Field Supervisor Pete Benjamin renewed Mr. Ferebee's Feb. 6, 2014 take authorization based on Mr. Ferebee's self-reported evidence of wolf activity and telemetry data from the Red Wolf Recovery Program staff.  Pls. App. 957-58 (Letter from Benjamin to Ferebee (Sept. 23, 2014)).

120.    The September 23, 2014 renewal stated that "[i]t does appear that the radio-collared adult male red wolf that you were previously authorized to take is still using your property," however, the original February 6, 2014 take authorization made no mention of a specific radio-collared male red wolf and in fact disclaimed any proof of red wolves using Mr. Ferebee's property at that time. <u>Id</u>.

121.    The authorization "granted permission to take this animal (should it be a red wolf) by lethal means." <u>Id</u>.

122.    There is no evidence of a wolf with problem or offending behavior using Mr. Ferebee's land at the time the take authorization was renewed.

123.    By October 30, 2014, the Service had received 405 individual requests.  Pls. App. 951 (E-mail from Beyer to Pete Benjamin (Oct. 30, 2014)).

124.    Of these, 24 were duplicate requests from the same address, 43 contained no contact information, 282 never responded to USFWS's staff response to the removal request, 14 were only petition signatories, 25 were from landowners who reported no actual wolves on their properties, 21 were from landowners who had no wolves on their properties as determined by USFWS survey results, 2 refused access to USFWS, and 5 never followed-up after initially responding to USFWS's inquiry into their request. Pls. App. 951-52 (E-mail from Beyer to Pete Benjamin (Oct. 30, 2014)).  Only 9 requests were actively being worked by Service staff as of October 30, 2014. <u>Id</u>.

125.    The more than 400 removal requests received in summer of 2014 resulted in the capture and removal from private lands of 8 red wolves and 5 coyotes.  Pls. App. 960 (E-mail from Beyer to Eversen (Feb. 19, 2015)).  Four of the red wolves and three of the coyotes were

captured by Service staff, while the remaining canids were captured by private trappers or landowners. Id.

126.    Red wolves that were removed from private lands and at a later date released back into the wild were released on to either Alligator River National Wildlife Refuge or Pocosin Lakes National Wildlife Refuge.  [DE 40 ¶ 114]; see also [DE 37 ¶ 114].

127.    In September 2014, the Service developed "Procedures for responding to landowner requests to remove red wolves from private property," in order to respond to the large number of requests.  Pls. App. 962-63.

128.    In the case of properties with evidence of "consistent recent wolf presence," the procedures stated that "[i]f access to the property is provided we will plan to begin trapping efforts pending staff availability and weather.  We may also issue a letter authorizing the landowner to trap wolves under our current State permit."  Id.  If the landowner did not provide access to the property, the procedures stated "we will issue a letter authorizing the landowner to trap wolves under our current state permit." Id.

129.    When issuing letters authorizing landowners to trap endangered red wolves under the Service's State permit, Service staff did not provide specific training to trappers or any sort of oversight of the trapping efforts.  Pls. App. 147-51 (Beyer Depo 211:06-215:03).

130.    According to a 2014 e-mail from Assistant Regional Director Miranda, an exception for wolves with "behavioral" issues could be used to hold in captivity for extended periods wolves that instinctually returned to their home ranges. Pls. App. 964 (E-mail from Miranda to Beyer (Sept. 30, 2014)).

131.    On October 28, 2014, Field Coordinator Art Beyer requested guidance "on how to deal with wolves captured in response to landowner requests for their removal," and explained

that with a wolf pup currently being held in captivity, he was concerned about the "risk [of] having a wolf that is too tolerant of people" and whether it would be "accepted back into the social structure of the pack." Pls. App. 965 (Email from Beyer to Benjamin et al. (Oct. 28, 2014)). Mr. Beyer stated he "would like to release this wolf as soon as possible." Id.

132.    On October 31, 2014, Field Coordinator Art Beyer expressed concern about an apparent take authorization request, noting "if local wolves aren't using his property much, we may open the door for him to shoot dispersing wolves such as the one captured yesterday." Pls. App. 967 (Beyer to Benjamin et al. (Oct. 31, 2014)).

133.    In November 2014, Field Coordinator Art Beyer wrote to Pete Benjamin regarding requests for removal of red wolves from two properties, saying "I didn't know if you were still being asked or directed to issue a letter authorizing take to either [redacted name] or [redacted name]," and explained that "I am still unclear at what point abandonment takes place, particularly if access is never provided or removed during our effects to capture wolves. Based on previous discussions with the Solicitor, it is our understanding that foreclosure to access does not equate to abandonment of effort." Pls. App. 968-69 (E-mail from Beyer to Benjamin (Nov. 20, 2014)).

134.    The Service completed its last sterilization of a coyote before suspending the practice in 2015. Pls. App. 22-24 (Harrison Depo 95:24-97:03); Pls. App. 223-25 (Benjamin I Depo 83:06-85:06). According to then-Assistant Recovery Coordinator Rebecca Harrison, there was not a biological reason to end coyote sterilizations at that time, and she does not know who made the decision to stop coyote sterilizations. Pls. App. 23 (Harrison Depo 95:09-23). Art Beyer and Field Supervisor Pete Benjamin also do not know who made the decision to stop

coyote sterilizations.  Pls. App. 136 (Beyer Depo 174:09-24); Pls. App. 223-24 (Benjamin I Depo 83:06-84:14).

135.    Based on input from the red wolf recovery program staff, Field Supervisor Pete Benjamin recommended to Assistant Regional Director Leopoldo Miranda that capture and sterilization of coyotes be maintained. Pls. App. 225-26 (Benjamin I Depo 85:07-86:11).

136.    Assistant Regional Director Leopoldo Miranda recommended to Regional Director Cynthia Dohner that coyote sterilizations be stopped.  Pls. App. 195 (Miranda Depo 98:17-19).

137.    In 2013 the Service completed its last documented release of a captive red wolf into the wild population via a pup-fostering event before announcing in June 2015 that it had suspended the practice of releasing captive wolves into the wild population.  Pls. App. 596 (3rd Quarter Report, Apr. – June 2013); Pls. App. 970-71 (USFWS News Release, Service Halts Red Wolf Introductions Pending Examination of Recovery Program, June 30, 2015 (hereinafter "June 30, 2015 FWS Release")).  According to then-Assistant Recovery Coordinator Rebecca Harrison, there was not a biological reason to end pup-fostering, and she did not know who made the decision to end pup-fostering. Pls. App. 20-22 (Harrison Depo 93:14-95:05).  Art Beyer and Field Supervisor Pete Benjamin also do not know who made the decision to end pup-fostering. Pls. App. 136-37 (Beyer Depo 174:25-175:19); Pls. App. 227-28 (Benjamin I Depo 89:11-90:11).

138.    Assistant Regional Director Leopoldo Miranda recommended to Regional Director Cynthia Dohner that releasing captive red wolves into the wild population be stopped. Pls. App. 196-97 (Miranda Depo 99:15-100:08).

139.    On January 29, 2015, the North Carolina Wildlife Resources Commission passed two resolutions regarding red wolves in North Carolina.  The first asked the Service to among other things:

- "declare in federal rules that the red wolf is extinct in the wild in North Carolina; and

- "terminate the Red Wolf Reintroduction Program for free-ranging red wolves in North Carolina."

Pls. App. 972-74 (2015 WRC Resolutions).

140.    The second resolution from the NCWRC asked the Service to "immediately capture and remove those wolves [released onto private lands], including any offspring arising solely therefrom."  Id.

141.    The Service issued no formal response to either resolution. Pls. App. 198-202 (Miranda Depo 139:12-143:18); Pls. App. 234-35 (Benjamin Depo 130:16-131:10).

142.    On February 24, 2015, Cynthia K. Dohner, Regional Director for the Southeast Region of USFWS, prepared an Information Memorandum for the USFWS Director detailing the actions taken by the Regional Office regarding the red wolf program and planned future steps for the program.  Pls. App. 975-79 (Memo from Dohner (Feb. 24, 2015)).

143.    The February 24, 2015 Dohner memorandum lists the following actions the Service had recently taken regarding the red wolf recovery program:

- Expanded the Service's partnership with the North Carolina Wildlife Resources Commission;

- Shifted program management of the red wolf recovery program from the National Wildlife Refuges System to Ecological Services;

- Reassigned the red wolf recovery program coordinator;

- Stopped releasing wolves onto private lands from captivity;

- Issued first ever take authorization, signed by ES Assistant Regional Director

- Developed a new agreement with the NC Wildlife Resources Commission to form the "Albemarle Peninsula Canid Conservation Collaborative"; and

- Contracted with the Wildlife Management Institute to evaluate the Red Wolf Recovery Program.

Id.

144.    The February 24, 2015 Dohner Memorandum went on to explain alternatives for the future of the red wolf recovery program, including a common first step for all alternatives that included:

- Managing and operating the program from federal lands

- Honoring all landowner removal requests

- Issuing a take authorization if recapture events are not successful.

Id.

145.    Each alternative in the memorandum, including the common first step, would require Section 7 consultation and NEPA compliance. Id.

146.    In a 2015 e-mail to a private landowner, Assistant Regional Director Miranda stated that two wolves trapped by the landowner "will not be released back into the wild at least until we make a final determination on the future of this population." Pls. App. 980 (E-mail from Miranda to [Redacted Name] (Feb. 9, 2015)).

147.    In March 2015, Assistant Recovery Coordinator Rebecca Harrison told Field Supervisor Pete Benjamin that "I have some concerns about the apparent hesitancy from the RO [regional office] about releasing these animals," referring to two wild wolves of breeding age, in

good health, being held at the Sandy Ridge captive breeding facility." <u>See</u> [DE 32-12]. Ms. Harrison explained that the wolves had been held for 3-5 weeks "waiting for a decision to release them," and "[t]he longer we hold them, the more risk there is of them becoming acclimated to captivity and potentially tolerant to humans." <u>Id</u>.

148.    In 2015, a red wolf was held in captivity at the Sandy Ridge facility for eight to nine months before ultimately being transferred to a captive breeding facility after program staff expressed concerns about holding the wolf for an extended period. Pls. App. 31-38 (Harrison Depo 151:6-158:12); Pls. App. 154-60 (Beyer Depo 234:10-240:20); Pls. App. 986 (E-mail from Beyer to Miranda (Feb. 9, 2015)); Pls. App. 987 (E-mail from Beyer to Benjamin (Mar. 18, 2015)). The wolf was held in captivity for that duration because "[t]he Program staff was waiting on instruction" from their "supervisory chain." Pls. App. 31-32 (Harrison Depo 151:22-152:24). The program staff expressed "[c]oncerns about holding the animal" for a long amount of time because "the concern about holding an animal past two to three months was that it could potentially acclimated [sic] to human activity and not be a good release candidate back into the wild population." Pls. App. 34-35 (Harrison Depo 154:6-155:3). This wolf that was held for eight to nine months "did not get put back on the landscape . . . . Because we held it for over three months, and it wasn't a good candidate to be reintroduced for that particular case." Pls. App. 35 (Harrison Depo 155:10-19).

149.    On March 19, 2015, Mr. Ferebee e-mailed Leopoldo Miranda and Pete Benjamin requesting renewal of his February 6, 2014 take authorization. Pls. App. 988 (E-mail from Ferebee to Miranda & Benjamin (Mar. 19, 2015)).

150.    In an e-mail discussing the March 19, 2015 Ferebee request, Field Coordinator Art Beyer explained that the Service had no evidence of wolves using the property, had not made

attempts to capture any animals from the property, and had denied similar requests. Pls. App. 991 (E-mail from Beyer to Miranda (Mar. 19, 2015)).

151.    Leopoldo Miranda responded to Mr. Ferebee's e-mail on the same day it was received, stating "I will work with Mr. Benjamin on the renewal of your authorization. As with the last one, it will come out under his signature." Pls. App. 992 (E-mail from Miranda to Ferebee (Mar. 19, 2015)).

152.    When a draft of the take authorization renewal was circulated to Red Wolf Recovery Program staff on March 20, Field Coordinator Art Beyer "reiterate[d] that I do not believe we are following our current rules by issuing a take letter when there is no indication or evidence of wolf use on or adjacent to his property, and thus have not abandoned any efforts at removal, and that lack of access should again not be grounds for abandonment." Pls. App. 993-94 (E-mail from Beyer to Benjamin (Mar. 20, 2015)).  Mr. Beyer emphasized that "[w]e have denied requests for take letters under the same conditions." Id.

153.    On April 27, 2015, Field Supervisor Pete Benjamin again renewed the Feb. 6, 2014 take authorization to Mr. Ferebee, "grant[ing] permission to take a wolf."  Pls. App. 998-1000 (Letter from Benjamin to Ferebee (April 27, 2015)).

154.    While three wolves were removed from Mr. Ferebee's property in February 2015, the Service had no evidence of any wolves using Mr. Ferebee's property three months later when the take authorization was renewed on April 27, 2015. Id.

155.    Assistant Red Wolf Recovery Coordinator Rebecca Harrison was not aware that the renewal was issued to Mr. Ferebee on April 27, 2015, until May 20, 2015.  Pls. App. 1002-3 (Email from Harrison to Benjamin (May 20, 2015)); Pls. App. 48-52 (Harrison Depo 200-204).

156.     On May 20, 2015, Field Supervisor Pete Benjamin issued additional lethal take authorizations to two different landowners who had not previously received a take authorization and shared a common farm manager, pursuant to 50 C.F.R. § 17.84(c)(4)(v). Pls. App. 1001 (E-mail from Benjamin to [Redacted Name] (May 20, 2015)); Pls. App. 1004-5 (Letter from Benjamin to [Redacted Name] (May 20, 2015)); Pls. App. 1006-7 (Letter from Benjamin to [Redacted Name] (May 20, 2015)); Pls. App. 42-43, 43-44 (Harrison Depo 194:09-195:04; 195:15-196:04).

157.     Assistant Red Wolf Recovery Coordinator Rebecca Harrison expressed concerns about the issuance of this take authorization.  Pls. App. 46 (Harrison Depo 198:06-198:16).

158.     Two days before issuing the take authorization, Pete Benjamin informed the recipient landowners that the Red Wolf Recovery Program staff were going to conduct a telemetry flight the next day because they suspected that a female red wolf with pups might be in the area, but he assured the property owners that "[t]he knowledge one way or the other will not affect my decision to issue you a take permit," and that "I'll have your letters by Wednesday." Pls. App. 1008 (E-mail from Benjamin to [Redacted Names] (May 18, 2015)).

159.     On June 17, 2015, the farm manager for the two property owners who received the May 20, 2015 take authorization shot and killed a six year-old denning mother red wolf. [DE 40 ¶ 105]; see also [DE 37 ¶ 105]; Pls. App. 1009 (E-mail from Benjamin to Beyer et al. (June 18, 2015)).

160.     The killed wolf was wild-born, had mothered a total of 16 confirmed pups through four separate litters, and was suspected to have had another litter at the time she was shot. Id.

161.    A physical inspection of the carcass indicated the killed wolf was likely nursing a current litter of pups. Id.

162.    The killed wolf had not displayed any problem or offending behavior. Pls. App. 1013 (E-mail from Benjamin to [Redacted Name] (June 18, 2015)).

163.    The farm manager who killed the wolf requested a second take authorization, and Pete Benjamin informed him that he would begin coordinating with the Regional Office regarding the request. Id.; Pls. App. 1009 (E-mail from Benjamin to Beyer et al. (June 18, 2015)).

164.    Pete Benjamin informed the farm manager who killed the wolf that the death would likely be classified as gunshot rather than management-related, and stated "[y]ou were acting under the authority of our regulations as determined and informed by me." Pls. App. 1015 (E-mail from Benjamin to [Redacted Name] (June 19, 2015)).

165.    In June 2015, after approximately 25 years with the Red Wolf Recovery Program, Field Coordinator Art Beyer left the program for a position with the National Wildlife Refuges System. Pls. App. 60 (Beyer Depo 42:01-07); Pls. App. 6-7 (Harrison Depo 34:24-35:01). Mr. Beyer maintains some communication and involvement with the red wolf recovery program in her current role. Pls. App. 61-63 (Beyer Depo 58:20-60:12).

166.    Mr. Beyer's position was not filled after he transferred. Pls. App. 10 (Harrison Depo 41:5-7).

167.    In 2015, Service staff higher in the supervisory chain than Pete Benjamin made a decision "to basically only do those actions that are explicitly authorized in our current regulation." Pls. App. 251-53 (Benjamin II Depo 111:19-113:12).

34

168.     In June 2015, the Service formally announced the suspension of reintroducing red wolves into the wild and the suspension of its coyote sterilization program.  Pls. App. 1016-17 (June 30, 2015 FWS Release); [DE 32 ¶16].

169.     On June 30, 2015, the U.S. Fish and Wildlife Service revised its population estimates for the wild red wolf population down to 50 known wolves, with an estimated total of 50-75 wild red wolves, and listed nine mortalities to date for 2015. See [DE 37-14].

170.     Also on June 30, 2015, Assistant Regional Director Miranda sent a memo to Red Wolf Recovery Program Staff regarding the "Regional Interpretation of 'Take' in the Special Rule for Red Wolf Non-Essential Experimental Population in Eastern North Carolina." Pls. App. 1018-19.

171.     This memorandum included an interpretation of 50 C.F.R. § 17.84(c)(4)(v) that stated "After abandoning its efforts to capture a red wolf, the Service may allow the landowner to take red wolves found on his or her property through actions approved by the Service in writing.  We interpret this provision to allow the Service to approve actions that could result in any form of take, including, but not limited to, take that is lethal." Id.

172.     The memorandum also included an attachment entitled "Procedures for Responding to Landowners' Requests to Remove Red Wolves from Private Property" which was intended to be followed when implementing the interpretation of 50 C.F.R. § 17.84(c)(4)(v).  Pls. App. 1020-21.

173.     The procedures explain that if landowners requesting the removal of red wolves from their property deny access to Service personnel, then they can be given trapping authorization, and if they trap a wolf and the wolf returns to the property, or "if reasonable efforts to capture wolves" are unsuccessful, a lethal take authorization will be issued. Id.

174. The procedures for attempting to capture red wolves on private property do not distinguish between problem wolves and non-problem wolves, except that "[r]equests that involve known or suspected depredation will be responded to within 48 hours." Id.

175. Pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), Plaintiffs furnished the U.S. Secretary of the Interior, USFWS Director, and USFWS Regional Director for the Southeast Region with written notice of their intent to bring suit for the violations of law at issue in this case on September 1, 2015. [DE 40 ¶ 7]; see also [DE 37 ¶ 7].

176. On September 10, 2015, Field Supervisor Pete Benjamin signed a final "Intra-Service Section 7 Biological Opinion for the Red Wolf (*Canis rufus*) Captive Transfer Program and associated wild release" which reviewed the "currently suspended captive transfer program of the federally endangered red wolf . . . from the captive breeding facilities into the Northeaster North Carolina recovery area." Pls. App. 467 (2015 Biological Opinion). The Biological Opinion analyzed "the effects of any potential take associated with this programs action if it is reactivated in the future," and concluded that "transfer of captive breed [sic] red wolves from participating SSP facilities across the nation into the wild NEP in northeastern North Carolina, as proposed, is not likely to jeopardize the continued existence of the red wolf." Pls. App. 467, 482-83.

177. The Biological Opinion stated that such an action "should not negatively affect the population stability of the red wolf in either the captive SSP facilities or the NEP," explaining that the SSP populations "are controlled and remain stable" and that the action "should benefit and increase the population genetics and stability of the NEP by the transfer and relocation of wolves." Pls. App. 474.

178.    On October 27, 2015, the Service announced the membership of a red wolf recovery team and revised its estimated completion date for a review of the red wolf recovery program to summer 2016.  The Service stated that it was using the review to "examine feasibility of recovery" of the red wolf.  Pls. App. 1023 (USFWS Red Wolf Recovery Program Review FAQs); see also Pls. App. 1030 (Red wolf non-essential population management decision Q & A). Ben Prater of Defenders of Wildlife was invited to serve on this red wolf recovery team.  Pls. App. 1052-53 (Letter from Dohner to Prater (Sept. 28, 2015)).

179.    As of October 29, 2015, the Service estimated there were 50-75 red wolves in the wild, based on 50 known wolves and 11 mortalities to date in 2015.  Pls. App. 1060 (Oct. 29, 2015 Red Wolf Mortality Chart).

180.    In 2015 and continuing into 2016, the red wolf recovery program continued to receive requests from private landowners to remove wolves from private lands in 2015 and 2016.  Pls. App. 25-27 (Harrison Depo 130:19-132-06).

181.    On Dec. 23, 2015, Red Wolf Recovery Program Assistant Coordinator Rebecca Harrison e-mailed Leo Miranda estimating that 3 packs, with a total of 11-40 animals, would be subject to removal according to "5 recent inquiries about wolf removals on private lands."  Pls. App. 1061-62.  Ms. Harrison stated "[t]he removal of these entire packs from the landscape could have dramatic effects in recovery efforts," that "even these lower estimates still represent important breeding pairs and packs," and "[l]osing these animals from the landscape would impact any ability to reduce coyote introgression and our ability to manage wolf intact pairs." Id; see also Pls. App. 28-30 (Harrison Depo 133:13-135:18).

182.    On February 26, 2016, a private trapper captured a red wolf on Bee Tree Farms, owned by Jett Ferebee.  Mr. Ferebee called Assistant Regional Director Leopoldo Miranda about

the captured wolf that was being held in a kennel in a garage on the property and stated that the wolf could not be retrieved by the Service that evening. Pls. App. 1063 (Benjamin Notes re: Feb. 26-27).

183.     The morning of February 27, 2016, Mr. Ferebee e-mailed Field Supervisor Pete Benjamin demanding a take authorization. Pls. App. 1063-65; Pls. App. 1083-86 (Ferebee, Benjamin E-mail Chain (Feb. 27 2016)).  Mr. Benjamin called Mr. Ferebee and left him a message about arranging to retrieve the red wolf, but Mr. Ferebee only responded via e-mail stating "I prefer to deal with you in writing only," and asking, "Do I have a commitment from USFWS to not rerelease this animal only to return to my land? Will you give me the wolf ID number?  Will you renew my take permit?" Pls. App. 1065-67, 1082-83.  Mr. Benjamin responded that "[w]e will do everything we can within our rules to reduce the likelihood of [the wolf] returning to your farm," and "I've got your request for a take authorization letter, which  I will begin to process Monday when I'm back in the office." Pls. App. 1067, 1081.

184.     The red wolf was ultimately retrieved by a North Carolina Wildlife Resources Commission officer who in turn handed over the animal to USFWS wildlife biologist Michael Morse.  The wolf was then transferred to the Sandy Ridge facility. Pls. App. 1073.

185.     The wolf trapped on Jett Ferebee's property on February 26, 2016 and turned over to the Service on February 27, 2016 had an ID # of 12042F.  Pls. App. 1088, 1093-94 (E-mail chain, Harrison, Benjamin, Morse, Shipley (May 31 – June 2, 2016)).

186.     On March 1, 2016, after serving on the Red Wolf Recovery Team for nearly four months, Defenders of Wildlife Southeast Regional Director resigned from the Service's Red Wolf Recovery Team because "the Service is not fully committed to recovering the wolf in the wild."  Pls. App. 1100-1102 (Letter from Clark to Dohner (Mar. 1, 2016)).

187.    A March 9, 2016 population and mortality chart revised the population estimate to 45 known red wolves with an estimate of 45-60 red wolves. Pls. [DE 32-8].

188.    On March 11, 2016, Project Leader of the Coastal North Carolina National Wildlife Refuges Complex Mike Bryant e-mailed National Wildlife Refuge System Regional Chief David Viker about how "[t]he radical new direction of the red wolf program does not comport with my original understanding of the program," highlighting concerns Mr. Bryant had with how the Red Wolf Recovery Program's operations conflicted with "the purposes of these refuges." Pls. App. 1104-05.

189.    On April 7, 2016, Plaintiffs furnished the U.S. Secretary of the Interior, USFWS Director, and USFWS Regional Director for the Southeast Region with written notice of their intent to bring suit for additional violations of law. [DE 40 ¶ 7]

190.    In May 2016, Red Wolf Recovery Program Wildlife Biologist Ryan Nordsven expressed concern about the Service's practice of capturing holding red wolves in captivity: "We all know that we shouldn't be capturing wild wolves and keeping them in pens indefinitely, yet the last couple of years we've been doing it anyway. . . . But we really are not set up to hold wild animals long term – which shouldn't really be an issue because per our rule we should not be doing so anyway." Pls. App. 1106 (E-mail from Nordsven to Morse (May 15, 2016)).

191.    In discussing plans to release wild wolves removed from private lands, Wildlife Resources Commission staff asked Field Supervisor Pete Benjamin whether the Service "had any plans for a proactive response should either wolf return to the property from which it was originally trapped." Pls. App. 1108-09 (E-mail chain, Morse, Benjamin, Cobb (May 31 - June 14, 2016)). Mr. Benjamin responded "That is absolutely our intention," and "[i]f they wind up

back on those properties, or other properties where we know they are not welcome, we would try to remove them."  Pls. App. 1108.

192.    On June 13, 2016, the Service updated its online mortality chart to show 2 new mortalities in the wild red wolf population since the March 9, 2016 mortality chart, but maintained a count of 45 for known wild red wolves and an estimated 45-60 red wolves. Pls. App. 1114 (June 2016 Mortality Chart).

193.    The population estimates on the USFWS website and the mortality chart has not been updated since June 13, 2016.  See (USFWS, *Red Wolf Recovery*, https://www.fws.gov/redwolf/index.html (last visited Mar. 11, 2018)).

194.    In June 2016, a USFWS-commissioned Population Viability Analysis for the wild and captive red wolf populations was released. Pls. App. 1114. (Faust, L.J. et al., Red Wolf *(Canis rufus)* Population Viability Analysis (June 10, 2016)).  A population viability analysis "is a quantitative computer model that can be used to project a population's long-term demographic and genetic future." Pls. App. 1117.

195.    The PVA results include the finding that "current conditions, without releases from the SSP [red wolf Species Survival Plan captive breeding program] or improvements to NENC [northeastern North Carolina] vital rates, will result in extinction of the only remaining wild population of red wolves, typically within 37 years but in some iterations as soon as 8 years. Extinction will likely occur earlier than this timeframe because the population has already declined to lower than the model starting point." Pls. App. 1117, 1142.

196.    The PVA also included scenarios indicating that "the NENC population can avoid extinction and be viable."  Pls. App. 1117, 1142, 1132-33. Under 13 scenarios, the wild, NENC red wolf population would have less than a 10% probability of extinction.  Pls. App. 1142.

Eleven of these scenarios include annual releases of 3.3 red wolves from the captive breeding SSP program to the wild NENC.  Id.

197.    On June 24, 2016, the red wolf previously removed from Jett Ferebee's land on February 27, 2016 and another red wolf captured off of private lands on February 28, were released back into the wild onto Alligator National Wildlife Refuge.  Pls. App. 1177-1193 (E-mail chain, Shipley, Morse (June 14-24, 2016)); Pls. App. 1197 (E-mail from Colby to Shipley (Jun 27, 2016)); Pls. App. 1093-94 (E-mail from Morse to Shipley (June 2, 2016)).

198.    In July 2016, Assistant Red Wolf Recovery Coordinator Rebecca Harrison left the Supervisory Refuge Biologist position for a position with the National Wildlife Refuges System. Pls. App. 5, 11 (Harrison Depo 33:22-24; 53:19-23). Ms. Harrison maintains some communication and involvement with the red wolf recovery program in her current role.  Pls. App. 12 (Harrison Depo 55:03-55:22).

199.    When Ms. Harrison left the Red Wolf Recovery Program in July 2016, there were between four and six breeding pairs of red wolves in the wild. Pls. App. 18-19 (Harrison Depo 88:19-89:03).

200.    On August 7, 2016, the collar for the red wolf removed from Jett Ferebee's land on February 27, 2016, began emitting a mortality signal.  Pls. App. 1201 (E-mail chain re: wolf mortality event (Aug. 7-8, 2016)).  On August 8, 2016, Wildlife Biologist Ryan Nordsven collected the dead red wolf, and the Service determined the cause of death as vehicle strike. Pls. App. 1198; Pls. App. 1203 (Red Wolf Locations Map).

201.    On September 12, 2016, the USFWS Regional Office issued a memorandum entitled "Recommended Decisions in Response to Red Wolf Recovery Program Evaluation," which included a "proposed path forward for red a [sic] wolf recovery program . . . . based on the

evaluation of [the] red wolf recovery program led by the Red Wolf Recovery Team and WMI and other ecological and social science research conducted over the past year." Pls. App. 1204-05. The memorandum included a "recommendation on the future of the red wolf recovery program" and a recommendation "specific to the future of the NC NEP project." Pls. App. 1205.

202. The Sept. 12, 2016 memorandum recommended that the Red Wolf Recovery Program shift "resource allocation in order to secure the SSP Population and evaluate new NEP project sites across the historical range of the species." Pls. App. 1208. The recommendation included the following "implementation actions" and deadlines:

1. Expanding space capacity within the SSP by December 2017

2. Initiating the 5-year review process by Oct. 30, 2016, with a final document by Oct. 2017.

3. Identifying potential new reintroduction sites within the historic range by Oct. 2017 as part of the 5-year status review.

4. Developing a Species Status Assessment by October 2017 which would be used as the basis for a new Red Wolf Recovery Plan.

Id.

203. The September 12, 2016 memorandum stated that the wild red wolf population, or "NEP project population," was estimated at a "minimum of 28 monitored individuals consisting of 5 packs (which includes only 3 known breeding pairs)." Pls. App. 1209.

204. The September 12, 2016 memorandum recommended that the Service "[p]ublish a proposed new rule to change the size, scope and management of the current NEP project to protect the species by growing the SSP to a minimum of 400 animals with 52 breeding pairs,"

and "reducing the focus of [the] NEP project to federal lands within Dare County." Pls. App. 1210. This recommendation included the following "implementation actions" and deadlines:

1. Promulgating a new 10(j) rule to reduce the wild red wolf population to federal lands in Dare County, allowing for termination of the wild population "if it is no longer providing a contributing to recovery goals," allowing for "appropriate use of all management tools for population management" and redefining "the rights of private landowners formerly but no longer within the NEP area," with a target date of December 2017 for a final rule.

2. Managing the remaining wild red wolves as part of the SSP captive breeding program

3. Re-establishing small island populations within the National Wildlife Refuge System. Pls. App. 1210-12.

205.    On October 11, 2016, the scientific team who authored the red wolf Population Viability Analysis sent Regional Director Cynthia Dohner a letter about the "many alarming misinterpretations of the PVA [used] as justifications" for the September 12, 2016 memorandum. Pls. App. 1214-16 (Letter from Dr. Faust et al. to Dohner re population viability analysis (Oct. 11, 2016)). Rebecca Harrison, who assisted in authoring the PVA, recused herself from preparation of the letter. Id.

206.    The letter clarified that according to the red wolf Population Viability Analysis, "[t]he SSP is under no risk of extinction;" "the SSP can support releases to the wild without significant demographic impact at its current size;" and "[t]he SSP does not 'need' wild red wolves from North Carolina for its security" among other clarifications. Pls. App. 1214-16.

207.    As of December 31, 2016, the Service estimated the wild red wolf population at 25-48 animals, based on 22 known wild red wolves. Pls. App. 1217 (Dec. 2016 Mortality Chart).

208.    As of May 2017, as few as three known breeding pairs of red wolves were holding territory in the Red Wolf Recovery Area: one on Alligator River National Wildlife Refuge, one on the northern edge of Pocosin Lake National Wildlife Refuge, and on private lands north of Lake Mattamuskeet.  See Pls. App. 1219 (Map of Current Distribution); Pls. App. 68-109, 111-135, 168-69 (Beyer Depo 85:11-126:24; 140:22-164:16; 301:11-302:18).

209.    As few as two or three breeding pairs remain in the wild population as of November 2017.  Pls. App. 258-59 (Benjamin II Depo 145:04-146:13). A July 2017 population estimate and mortality chart, received through a Freedom of Information Act Request, continued to list 22 known wild red wolves as of 2016, but included 4 red wolf mortalities in 2017 and no updated population numbers for the year 2017.  Pls. App. 1220 (July 2017 Mortality Chart).

210.    In a population as small as the current red wolf population, the death or removal of a single red wolf "could have lasting impacts on the population and impair the ability of the population to recover." Pls. App. 739-40 (Vucetich Expert Rep.).

211.    The U.S. Fish and Wildlife Service's Frequently Asked Questions website continues to state, in response to a question about "actions the Service will undertake to manage the presence of Red Wolves on Private Lands," that it will "continue our efforts to remove red wolves from private lands when requested to do so by the landowner.  Private landowners also will be allowed to take animals when authorized by a permit in accordance with our regulation." See Pls. App. 1223 (USFWS, *Red Wolf Recovery Program Questions and Answers*, https://www.fws.gov/redwolf/faq.html (last visited Mar. 11, 2018); [DE 32-10]; Pls. App. 1030 (Red Wolf Non-Essential Population Management Decision Q & A).

212. The termination of the coyote sterilization program does not support recovery of the wild red wolf population. Pls. App. 139 (Beyer Depo 179:09-179:12); Pls. App. 734, 740-45 (Vucetich Expert Rep.).

213. The termination of USFWS's program of reintroducing wolves from the captive population into the wild population does not support recovery of the wild red wolf population. Pls. App. 139-41 (Beyer Depo 179:04-181:03); Pls. App. 734, 743, 750 (Vucetich Expert Rep.).

214. Since supervision of the Red Wolf Recovery Program was shifted from the National Wildlife Refuges program to Ecological Services, staff duties have changed from being focused solely on red wolves to include non-red wolves work. Pls. App. 39-40 (Harrison Depo 174:12-175:17); Pls. App. 216, 230-31 (Benjamin I Depo 35:12-24, 109:10-111:02); Pls. App. 1229 (E-mail from Harrison to Benjamin (Nov. 3, 2016)).

215. The wild red wolf population needs active management in order to have a sustainable wild population, and if active management is stopped, the population is likely to decline. Pls. App. 250 (Benjamin II Depo 92:13-23); Pls. App. 779 (Benjamin Rebuttal Expert Rep.); Pls. App. 753 (Vucetich Expert Rep.).

216. Resuming active management through releasing red wolves from the captive population into the wild population "would help offset losses" in the wild red wolf population and "theoretically, you could do it enough to stabilize the population." Pls. App. 263 (Benjamin II Depo 245:08-17). Resuming sterilization of coyotes in key parts of the red wolf recovery area "might help" avoid a population decline in the wild red wolf population. Pls. App. 263-64 (Benjamin II Depo 245:08-246:02).

217. Adaptive management of red wolves, including sterilizing coyotes, is necessary "for the persistence of the red wolf." Pls. App. 743, 45 (Vucetich Expert Rep.).

218.     Plaintiff organizations Red Wolf Coalition, Defenders of Wildlife, and Animal Welfare Institute, and their individual members, have interests in the endangered red wolf which have been and will continue to be harmed by Defendants' recent actions regarding the red wolf population. See [DE 32-3]; Pls. App. 1231 (Supp. Wheeler Decl.); [DE No. 32-43]; [DE No. 32-22], Pls. App. 1238 (Suppl. Prater Decl.); [DE 32-42]; [DE 32-9]; Pls. App. 1248 (Beeland Suppl. Decl.).

Respectfully submitted, this the 12th day of March, 2018.

                                    /s/ Sierra B. Weaver
                                    Sierra B. Weaver
                                    N.C. State Bar No. 28340
                                    sweaver@selcnc.org
                                    Derb S. Carter, Jr.
                                    N.C. State Bar No. 10644
                                    dcarter@selcnc.org
                                    Ramona H. McGee
                                    N.C. State Bar No. 47935
                                    rmcgee@selcnc.org

                                    SOUTHERN ENVIRONMENTAL LAW CENTER
                                    601 West Rosemary Street, Suite 220
                                    Chapel Hill, NC 27516
                                    Telephone: (919) 967-1450
                                    Facsimile: (919) 929-9421

                                    Attorneys for Plaintiffs

46

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2018, I electronically filed the foregoing **PLAINTIFFS'**

**STATEMENT OF UNCONTESTED FACTS** with the Clerk of the Court using the CM/ECF

system, which will automatically send notification of such filing to counsel for Defendants.

This the 12th day of March, 2018.

/s/ Sierra B. Weaver

Sierra B. Weaver