IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:15-cv-00042-BO

RED WOLF COALITION, DEFENDERS )
OF WILDLIFE, AND ANIMAL WELFARE )
INSTITUTE, )
)
             Plaintiffs, )
)
v. )
)
THE UNITED STATES FISH AND )
WILDLIFE SERVICE; JIM KURTH, in his )
official capacity as Acting Director of the )
United States Fish and Wildlife Service; and )
MIKE OETKER, in his official capacity as )
Acting Regional Director of the United States )
Fish and Wildlife Service Southeast Region,[1] )
)
             Defendants.

_____

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jim Kurth, Acting Director of the U.S. Fish and Wildlife Service, is substituted for Daniel M. Ashe, former Director, and Mike Oetker, Acting Regional Director of the U.S. Fish and Wildlife Service Southeast Region, is substituted for Cynthia Dohner, former Regional Director.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................... ii

**STATEMENT OF THE CASE** ................................................................................ 2

**STATEMENT OF FACTS** ...................................................................................... 4

**STANDARD OF REVIEW** ..................................................................................... 7

**ARGUMENT** ........................................................................................................... 8

  I.   DEFENDANTS HAVE CAPTURED AND KILLED ENDANGERED
      RED WOLVES IN VIOLATION OF THE ESA AND ITS
      REGULATIONS .................................................................................... 9

        A.   Defendants Have Violated ESA Section 9 in Granting Take
            Authorizations Prohibited by 50 C.F.R. § 17.84(c) .............................. 11

        B.   Defendants Have Violated ESA Section 4(d) by Failing to Provide
            for the Conservation of the Red Wolf .................................................. 15

  II.  DEFENDANTS HAVE FAILED TO MEET THEIR AFFIRMATIVE
      DUTIES TO CONSERVE RED WOLVES IMPOSED BY SECTION
      7 OF THE ESA. ..................................................................................... 17

        A.   Defendants Have Violated ESA Section 7(a)(1) by Failing to
            Provide for the Conservation of Red Wolves in Violation of ESA
            Section 7(a)(1). ..................................................................................... 20

        B.   Defendants Have Violated ESA Section 7(a)(2) by Failing to
            Ensure that Their Actions Are Not Likely to Jeopardize the
            Continued Existence of Red Wolves. ................................................... 22

  III.  DEFENDANTS HAVE FAILED TO FOLLOW REQUIRED
      PROCEDURES TO PROVIDE FOR THE CONSERVATION AND
      RECOVERY OF THE ENDANGERED RED WOLF. ............................ 24

        A.   Defendants Have Violated NEPA ........................................................ 24

        B.   Defendants Have Violated ESA Section 4 by Failing to Complete
            the Status Review .................................................................................. 27

  IV.  THIS COURT SHOULD ENJOIN DEFENDANTS FROM CAUSING
      JEOPARDY TO THE WILD RED WOLF. ........................................... 28

**CONCLUSION** ...................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

Animal Welfare Inst. v. Beech Ridge Energy LLC,
    675 F. Supp. 2d 540 (D. Md. 2009)........................................................................15

Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,
    538 F.3d 1172 (9th Cir. 2008) ..............................................................................26

Ctr. for Biological Diversity v. Vilsack,
    276 F. Supp. 3d 1015 (D. Nev. 2017).....................................................................21

Defs. of Wildlife v. Babbitt,
    958 F. Supp. 670 (D.D.C. 1997)............................................................................28

Defs. of Wildlife v. Norton,
    239 F.Supp. 2d 9 (D.D.C. 2002)............................................................................28

Defs. of Wildlife v. Tuggle,
    607 F. Supp. 2d 1095 (D. Ariz. 2009) ..............................................................11, 16

Defs. of Wildlife v. U.S. Fish & Wildlife,
    797 F. Supp. 2d 949 (D. Ariz. 2011) .....................................................................21

Florida Key Deer v. Paulison,
    522 F.3d 1133 (11th Cir. 2008) .........................................................................20, 22

Ford Motor Co. v. McDavid,
    259 F.2d 261 (4th Cir. 1958) ..................................................................................7

Friends of the Earth v. Laidlaw Envtl. Serv.,
    528 U.S. 167 (2000)................................................................................................8

Gibbs v. Babbit,
    214 F.3d 483 (4th Cir. 2000) .......................................2, 8, 9, 10, 14, 22, 25, 30

Greenpeace v. Nat'l Marine Fisheries Serv.,
    106 F. Supp. 2d 1066 (W.D. Wash. 2000)..............................................................23

Hughes River Watershed Conservancy v. Glickman,
    81 F.3d 437 (4th Cir. 1996) ...................................................................................27

Humane Soc. of U.S. v. Kempthorne,
    579 F. Supp. 2d 7 (D.D.C. 2008)............................................................................9

Humane Soc'y of the United States v. Zinke,
    865 F.3d 585 (D.C. Cir. 2017) ...................................................................28

Hunt v. Wash. State Apple Adver. Comm'n,
    432 U.S. 333 (1977) .....................................................................................8

Idaho Sporting Cong. v. Thomas,
    137 F.3d 1146, 1150-52 (9th Cir. 1998) ....................................................25

Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.,
    148 F.3d 1231 (11th Cir. 1998) .................................................................10

Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992) .....................................................................................8

Marsh v. Oregon Nat. Res, Council,
    490 U.S. 360 (1989) ...................................................................................25

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) .....................................................................................7

Miccosukee Tribe of Indians of Fla. v. United States,
    420 F. Supp. 2d 1324 (S.D. Fla. 2006) .....................................................27

Motor Vehicle Mfr's Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) .......................................................................................7

N.Y. Pub. Interest Research Grp., Inc. v. Johnson,
    427 F.3d 172 (2d Cir. 2005) .......................................................................27

Nat. Res. Def. Council, Inc. v. Daley,
    209 F.3d 747 (D.C. Cir. 2000) .....................................................................7

Nat'l Ass'n of Home Builders v. Defs. of Wildlife,
    551 U.S. 644 (2007) ...................................................................................22

Nat'l Wildlife Fed'n v. Hanson,
    859 F.2d 313 (4th Cir. 1988) ................................................................7, 29

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
    422 F.3d 782 (9th Cir. 2005) .....................................................................29

Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,
    556 F.3d 177 (4th Cir. 2009) .......................................................................7

In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.,
    818 F. Supp. 2d 214 (D.D.C. 2011) ...........................................................26

Red Wolf Coal. v. N. Carolina Wildlife Res. Comm'n ("RWC I"),
    2014 WL 1922234 (E.D.N.C. May 13, 2014) ...................................................5, 11, 14, 21, 22

Red Wolf Coalition v. U.S. Fish and Wildlife Service ("RWC II"),
    210 F. Supp. 3d 796 (E.D.N.C. 2016)...................................................2, 3, 5, 6, 7, 20

Ricci v. DeStefano,
    557 U.S. 557 (2009).....................................................................................................7

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989)...............................................................................................25, 26

Sierra Club N. Star Chapter v. LaHood,
    693 F. Supp. 2d 958 (D. Minn. 2010) ........................................................................27

Sierra Club v. Glickman,
    156 F.3d 606 (5th Cir. 1998) .....................................................................................20

Steamboaters v. F.E.R.C.,
    759 F.2d 1382 (9th Cir. 1985) ...................................................................................26

Strahan v. Coxe,
    127 F.3d 155 (1st Cir. 1997)......................................................................................11

Sylvia Dev. Corp. v. Calvert Cty., Md.,
    48 F.3d 810 (4th Cir. 1995) .........................................................................................7

Tennessee Valley Auth. v. Hill,
    437 U.S. 153 (1978)........................................................................................8, 17, 28

Thomas v. Peterson,
    753 F.2d 754 (9th Cir. 1985) .....................................................................................23

Tolan v. Cotton,
    134 S. Ct. 1861 (2014)..................................................................................................7

W. Land Exch. Project v. U.S. Bureau of Land Mgmt.,
    315 F. Supp. 2d 1068 (D. Nev. 2004)........................................................................25

Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1982)....................................................................................................28

Wilson v. Thomas,
    43 F. Supp.3d 628 (E.D.N.C. 2014)..............................................................................8

**Federal Statutes**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ..................................................................................................7

Endangered Species Act, 16 U.S.C. § 1531 et seq. ...................................................1

    16 U.S.C. § 1531(c)(1) ..............................................................................................9

    16 U.S.C. § 1532(3) ................................................................................................18

    16 U.S.C. § 1532(13) ..............................................................................................11

    16 U.S.C. § 1532(19) ..............................................................................................10

    16 U.S.C.§ 1533(b)(1)(A) .......................................................................................28

    16 U.S.C. § 1533(c)(2) ...............................................................................1, 3, 27, 28

    16 U.S.C. § 1533(d) .....................................................................1, 2, 9, 11, 15

    16 U.S.C. § 1536(a) ..................................................................................................1

    16 U.S.C. § 1536(a)(1) .........................................................................................3, 18

    16 U.S.C. § 1536(a)(2) ...........................................................2, 3, 9, 18, 23, 24

    16 U.S.C. § 1538(a)(1)(B) ......................................................................................10

    16 U.S.C. § 1538(a)(1)(G) ...................................................................................1, 14

    16 U.S.C. § 1538(g) ................................................................................................11

    16 U.S.C. § 1539(j)(2)(C) .......................................................................................10

    16 U.S.C. § 1539(j)(2)(C)(i) ...............................................................................18, 22

National Environmental Policy Act, 42 U.S.C. §§ 4321–47 ........................................1

    42 U.S.C. § 4321 ....................................................................................................25

    42 U.S.C. § 4332 ......................................................................................................3

    42 U.S.C. § 4332(C) .................................................................................................1

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................7

## Regulations

40 C.F.R. § 1508.27(b)(9)...................................................................................26

50 C.F.R. § 17.31(a).........................................................................................10

50 C.F.R. § 17.82.............................................................................................11

50 C.F.R. § 17.84(c)..........................................................10, 11, 14, 15, 16, 17, 24

50 C.F.R. § 17.84(c)(4)(i).................................................................................14

50 C.F.R. § 17.84(c)(4)(ii)................................................................................14

50 C.F.R. § 17.84(c)(4)(iii)...............................................................................14

50 C.F.R. § 17.84(c)(4)(iv)...............................................................................14

50 C.F.R. § 17.84(c)(4)(v)..............................................9, 10, 11, 12, 13, 14, 15, 17

50 C.F.R. § 17.84(c)(10)...................................................................................15

50 C.F.R. § 402.02......................................................................................23, 24

50 C.F.R. § 402.14......................................................................................23, 24

50 C.F.R. § 402.14(a).......................................................................................23

50 C.F.R. § 1502.9(c)(1)(ii)..............................................................................27

50 C.F.R. § 1508.27(b)(4)..................................................................................26

50 C.F.R. § 1508.27(b)(6)..................................................................................26

60 Fed. Reg. 18,940 (Apr. 13, 1995) (to be codified at 50 C.F.R. pt. 17).................13

81 Fed. Reg. 75,425 (Oct. 31, 2016)....................................................................28

Forty Most Asked Questions Concerning CEQ's National Environmental Policy
    Act, 46 Fed. Reg. 18,026 (March 23, 1981) (to be codified at 40 C.F.R. pts.
    1500-8)..................................................................................................26

Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final
    Rule, 51 Fed. Reg. 19,926 (Jun. 3, 1986) (to be codified at 50 C.F.R. pt. 402)....................23

Plaintiffs Red Wolf Coalition, Defenders of Wildlife, and Animal Welfare Institute (collectively, "Plaintiffs" or "Conservation Organizations") submit this memorandum in support of their Motion for Summary Judgment. In September 2016, this Court enjoined the U.S. Fish & Wildlife Service ("USFWS" or "the Service") from authorizing the capturing and killing of endangered red wolves, finding that Plaintiffs were likely to prevail on the merits of their claims under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., its implementing regulations, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47. Despite this ruling, Defendants have continued over the past eighteen months to dismantle the red wolf recovery program—standing by their termination of critical conservation actions—and in turn leaving this critically endangered population without *any* program for its conservation in the wild. The USFWS has similarly maintained its refusal to complete the required environmental analyses of these actions. Rather than attempting to justify its decisions on some conservation basis, the Service has effectively admitted that they are politically motivated.

Without a decision from this Court declaring these actions illegal, the USFWS is poised to facilitate the second extinction of the red wolf in the wild—without any of the scientific analysis, public involvement, and informed decisionmaking required by Congress. Defendants have caused the illegal take of an endangered red wolf, are failing to provide for the conservation of the species, and are likely to jeopardize the red wolf's continued existence in the wild, in violation of the ESA, 16 U.S.C. §§ 1538(a)(1)(G), 1533(d), 1536(a). Defendants have also failed to perform required NEPA analysis under 42 U.S.C. § 4332(C), and perform the five-year status review required by the ESA, 16 U.S.C. § 1533(c)(2).

## STATEMENT OF THE CASE

Four pairs of endangered red wolves (*Canis rufus*) were reintroduced into Alligator River National Wildlife Refuge in 1987. For 30 years, this population has lived, and until recently thrived, on its 1.7 million acre recovery area in eastern North Carolina's Dare, Tyrell, Beaufort, Hyde, and Washington Counties. See Gibbs v. Babbit, 214 F.3d 483, 488 -89 (4th Cir. 2000) (discussing history of red wolf reintroduction). From 2002 to 2014, the wild red wolf population consistently numbered over 100 animals, but in 2015 the population declined to 50-75 animals, and in 2016 it dropped to 25-48 animals. USFWS has released no new population estimates for 2017, but admits there were as few as two or three breeding pairs in the wild in November 2017. Scientists have called this population decline "catastrophic" and warned that if current management continues, red wolves could again be extinct in the wild by 2024.

While wild red wolves have faced a number of threats, the biggest threat in recent years has been the U.S. Fish and Wildlife Service itself. In sum, the Service has dramatically expanded actions harmful to the species while ending the positive conservation measures has taken for red wolves in eastern North Carolina throughout the program. As this Court found in September 2016, Defendants' "management of the wild red wolf population fail[ed] to adequately provide for the protection of red wolves and may in fact jeopardize the population's survival in the wild in violation of Sections 4 and 7 or the ESA." Red Wolf Coalition v. U.S. Fish and Wildlife Service, 210 F. Supp. 3d 796, 804 (E.D.N.C. 2016) (hereinafter "RWC II"). Internal Service documents amply display concerns of Defendants' own biologists with the removal of non-problem wolves and the practice's incompatibility with the ESA's mandates to "provide for the conservation of" the species, 16 U.S.C. § 1533(d), and act in a manner "not likely to jeopardize the continued existence" of the red wolf species, 16 U.S.C. § 1536(a)(2).

The Service is also violating the ESA's affirmative mandates to implement proactive conservation measures, 16 U.S.C. § 1536(a)(1), and ensure that its actions are not likely to jeopardize the continued existence of the species. Id. at § 1536(a)(2). These requirements go beyond the take exceptions codified in the red wolf rule and ask whether the Service is taking the actions necessary to bring the red wolf to a place where the protections of the Act are no longer necessary. The Population Viability Assessment ("PVA") conducted in 2016 found that current management is likely to lead to the extinction of the red wolf in the wild in as few as 8 years. The PVA also found, however, that restarting the proven practice of releasing captive-born wolves into the wild and increasing wild red wolf breeding rates would change that trajectory. Red wolf releases and coyote sterilization—necessary to avoid hybridization and encourage the production of red wolf pups—were formally terminated in 2015 with disastrous consequences.

Each of these changes in red wolf management has been undertaken without the analysis required by the ESA to ensure that federal actions are "not likely to jeopardize the continued existence" of red wolves, 16 U.S.C. § 1536(a)(2), the analysis required by NEPA for "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332, or even the ESA's requirement that the USFWS conduct a status review to determine whether management changes are needed to meet the Act's purpose to recover the species, 16 U.S.C. § 1533(c)(2). Again, this Court found Plaintiffs likely to prevail on their claim that the Service violated NEPA by virtue of its policy change without any supporting analysis. RWC II at 805. And yet, 18 months following this Court's preliminary injunction on these very matters, the USFWS has only made the barest of gestures toward remedying its clear legal violations.

## STATEMENT OF FACTS[2]

The USFWS has called the red wolf reintroduction in eastern North Carolina a model for predator reintroductions. Pls. Stmt. Facts ¶ 82. The red wolf recovery program has throughout its history actively managed both the endangered red wolf population as well as the non-native coyote population in order to provide for the conservation of the red wolf. Id. ¶¶ 25-78. Biologically, the reintroduction was remarkably successful, id. ¶ 80, overcoming the critical threat posed by hybridization with coyotes and growing to a consistent population of over 100 animals in the late 1990s. Id. ¶¶ 20, 81. That success rapidly vanished after 2013, when the Red Wolf Program was transferred from the jurisdiction of the National Wildlife Refuge system, which had long managed it successfully, to Ecological Services. Id. ¶¶ 10, 93-95. Although both programs are housed within USFWS, they have different staff, cultures, and operating guidance. Id. ¶ 95. The only reason offered for this shift was administrative convenience. Id. ¶ 96.

With this transfer, decisionmaking shifted from long-serving red wolf biologists to higher-level agency staff, 600 miles away from the Red Wolf Recovery Area. Program policies shifted as well, away from the successful decades-long approach of providing for the conservation of the red wolf, to those intended to appease contentious landowner relationships. Service documents show that for nearly two decades, program staff had discretion to not remove non-problem red wolves when requested by a landowner, because doing so could severely undercut Service efforts to control hybridization with coyotes and to grow the red wolf population. Pls. Stmt. Facts ¶¶ 39-53. Soon after the Red Wolf Recovery Program was shifted from Refuges to Ecological Services, however, the Service developed new procedures directing

---

[2] Plaintiffs refer the Court to their separate Statement of Uncontested Facts for a more detailed discussion of the underlying facts. We incorporate that document here by reference.

program staff to remove *any* wolves upon request by landowners, regardless of whether the wolf was in fact posing any sort of problem. Id. ¶¶ 127-28, 142-45, 170-73, 211.

In 2014, Assistant Regional Director Leopoldo Miranda issued the first ever take authorization to landowner Jett Ferebee. Id. ¶ 102-08. In doing so, the Service acted contrary to the red wolf rule by issuing the take authorization even though the landowner refused to allow Service personnel on his property to attempt to capture wolves, the agency did not have confirmation that wolves were using the property at the time, and the agency had no indication the wolves were threatening the landowner's property or safety. Id. The Service subsequently "renewed" this take authorization on September 23, 2014 and again on April 27, 2015, without first attempting to trap wolves on or near the property in question. Id. ¶¶ 119-122, 153-155.

In May 2015, the Service issued take permits to two additional landowners who barred the Service access to their property to kill red wolves that had not exhibited any "problem" or "offending behavior." Pls. Stmt. Facts. ¶¶ 156, 162. On June 17, 2015, the landowners' farm manager shot and killed a denning mother wolf who had previously mothered a total of 16 pups through four separate litters. Id. ¶¶ 159-60. Service staff believed the wolf had another litter of pups when it was killed, and may have still been nursing those pups. Id. ¶¶ 158, 160.

In June 2015, the Service also announced that it was both ending the reintroduction of red wolves into the wild and ending the sterilization of coyotes that had been so crucial to the success of the red wolf reintroduction. Id. ¶¶ 25-37, 73-82, see generally Red Wolf Coal. v. N. Carolina Wildlife Res. Comm'n, 2014 WL 1922234, at *8 (E.D.N.C. May 13, 2014) (hereinafter "RWC I") (discussing harm to USFWS's adaptive management plan when coyote hunting resulted in the shooting of sterile placeholder coyotes). Similar to the rule interpretations described above, these management changes did not undergo any formal process.

Following these actions, Southeast Regional Director Cindy Dohner issued a memo clarifying that (1) Defendants intentionally changed their interpretation and application of the red wolf rule, and (2) that reinterpretation was significant enough to trigger environmental reviews, including compliance with the ESA and NEPA. Pls. Stmt. Facts ¶¶ 142-45. That document states explicitly that the

> first step is an interim phase that requires that the Service manage and operate the reintroduction program from federal lands; all landowner removal requests be honored; and, if recapture efforts are not successful, that we issue "take" authorizations to those landowners as described in our 10(j) rule.

Pls. App. 977-78. The memo goes on to explain that "[t]hese changes include, but are not limited to, management of wolf populations only from federal lands, *a significant amount of wolves, currently on private lands, will be removed from the wild*." Pls. App. 977. (emphasis added). And the memo states "It is very important to point out that all alternatives (below), including this first step (above), require environmental compliance process." Id.

On September 12, 2016, two days before this Court's hearing on Plaintiffs' Motion for Preliminary Injunction, the Service announced its intent to move forward with the actions discussed and already underway, according to the Dohner memo from a year-and-a-half earlier. Pls. Stmt. Facts ¶¶ 201-204.

On September 29, 2016, this Court granted Plaintiffs' Motion for Preliminary Injunction, finding that

> [u]nless and until the Service terminates the red wolf recovery program and ceases its efforts in eastern North Carolina to restore this protected species in the wild, the public interest and equities of this case must weigh against the irreparable harm which would be caused by takes that are permitted because competing interests were more vocal or more effective, as failing to do so would fly in the face of 'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.

RWC II, 210 F. Supp. 3d at 806 (internal citation omitted).

## STANDARD OF REVIEW

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to the nonmoving party. Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014). However, "only 'reasonable' inferences from the evidence need be considered by the court." Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995) (quoting Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir. 1958)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

This Court previously determined that the appropriate standard of review for this case is set forth in the Administrative Procedure Act ("APA"). RWC II, 210 F. Supp. 3d at 801-02 (citing Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313, 316 (4th Cir. 1988)). The APA standard provides that a court shall set aside agency action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard," though deferential, "is not meant to reduce judicial review to a rubber-stamp of agency action." Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009) (internal citations and quotations omitted). Accordingly, courts must make a "searching and careful" inquiry into the facts, searching for whether "the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." Id. Their goal should be to understand "the choices open to the agency and those made," id. at 192-93, and to decide whether the agency's choices were "the product of reasoned decisonmaking." Motor Vehicle Mfr's Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52 (1983); see also Nat. Res. Def. Council, Inc.

7

v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000) (reminding courts that "merely to rubber stamp agency actions" would be "tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.") (internal citations and quotations omitted).

Plaintiffs, whose members regularly look for, observe, study, and appreciate red wolves in the wild, and whose interests are accordingly compromised by the Service's harm to red wolves, have standing to bring this suit. See generally Pls. App. 1231 (Supp. Wheeler Decl.); Pls. App. 1238 (Supp. Prater Decl.); Pls. App. 1248 (Supp. Beeland Decl.); see also [DE 32-3]; [DE 32-43]; [DE 32-22]; [DE 32-42]; [DE 32-9]; Friends of the Earth v. Laidlaw Envtl. Serv., 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."); Lujan v. Defs. of Wildlife, 504 U.S. 555, 562-63 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); Wilson v. Thomas, 43 F. Supp.3d 628, 632 (E.D.N.C. 2014) (finding standing where "the organization represents the interests of constituents who would otherwise have standing") (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343-47 (1977)).

## ARGUMENT

Considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the ESA embodies Congress's "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180, 184 (1978) (hereinafter "TVA v. Hill"). The Fourth Circuit has declared that the "overall federal scheme [of the ESA is] to protect, preserve, and rehabilitate endangered species, thereby conserving valuable wildlife resources important to the welfare of our country." Gibbs v. Babbitt, 214 F.3d 483, 492 (4th Cir. 2000). Specifically noting the red wolf's

experimental status, the Fourth Circuit noted that "it would be perverse indeed if a species nearing extinction were found to be beyond Congress's power to protect" it.  Id. at 498.

Congress designed the ESA to ensure the conservation of listed species, including the red wolf.  See 16 U.S.C. § 1531(c)(1) ("It is further declared to be the policy of Congress that *all* Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.") (emphasis added); id. § 1533(d) (requiring USFWS to "provide for the conservation" of listed species); id. § 1536(a)(2) (requiring federal agencies to ensure their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species").  Each of these requirements is at play in the case before the Court, and under each standard, Defendants' current reinterpretations of the red wolf rule and management of the wild red wolf population falls far short.  See Humane Soc. of U.S. v. Kempthorne, 579 F. Supp. 2d 7, 20 (D.D.C. 2008) (requiring agency to explain "how its interpretation serves the ESA's myriad policy objectives," including addressing "any legitimate concerns that its interpretation could undermine those policy objectives").

This is the legal backdrop against which the Service has dismantled red wolf recovery in the wild.  The agency's legal violations are both substantive and procedural, and all contribute significantly to the imperilment of the endangered red wolf.

## I.  DEFENDANTS HAVE CAPTURED AND KILLED ENDANGERED RED WOLVES IN VIOLATION OF THE ESA AND ITS REGULATIONS.

For the first time in the history of the red wolf recovery program, in 2014 the Service authorized a private landowner to kill a red wolf on his property pursuant to 50 C.F.R. § 17.84(c)(4)(v). [DE 40 ¶ 92]; Pls.' App. 938 (Letter from Miranda to Ferebee (Feb. 6, 2014)).  For the first time in the history of the red wolf recovery program, in 2015 the Service caused a

red wolf to be killed pursuant to a private landowner take authorization granted under 50 C.F.R. § 17.84(c)(4)(v). Pls. App. 1001 (E-mail from Benjamin to Redacted (May 20, 2015); Pls. App. 1004-1007 (May 20, 2015 Take Auths.); Pls. App. 1009 (E-mail from Benjamin to Beyer et al. (June 18, 2015)); [DE 40 ¶ 105]. While the red wolf regulations allow for the lethal take of red wolves in certain limited circumstances, those circumstances were not present when the USFWS issued the 2014 take authorization or the 2015 take authorization that resulted in the death of an endangered red wolf. These take authorizations represent not only a violation of the plain text of the Service's regulations, but also a significantly modified interpretation and implementation of provisions that had previously been limited to allow the capturing and killing of only problem wolves. The USFWS has violated and will continue to violate both ESA Section 9 and ESA Section 4(d) by causing the unlawful take of endangered red wolves and implementing 50 C.F.R. § 17.84(c) in a way that does not provide for the conservation of the species.

As this Court and the Fourth Circuit have confirmed, Section 9 is the "cornerstone" of the ESA and prohibits any person from taking an endangered species without a permit or other authorization. See Gibbs, 214 F.3d at 487 (citing 16 U.S.C. § 1538(a)(1)(B)). The ESA broadly defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." Id. (quoting 16 U.S.C. § 1532(19)). Pursuant to Section 10(j) of the ESA, experimental populations are treated as a threatened species for purposes of Section 9. See 16 U.S.C. § 1539(j)(2)(C), 50 C.F.R. § 17.31(a) (applying take prohibition to threatened species unless otherwise specified); Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla., 148 F.3d 1231, 1237 (11th Cir. 1998) (applying take prohibition to threatened species).

In addition to actions that directly "take" species, it is also unlawful for "any person" to "cause to be committed" any offense described in Section 9 or the red wolf rule. 16 U.S.C. § 1538(g); 50 C.F.R. § 17.84(c)(8); RWC I at *3 (finding NC WRC "caused to be committed" the take of red wolves through its authorization of coyote hunting); see also Strahan v. Coxe, 127 F.3d 155, 162 (1st Cir. 1997). The term "person" includes "any officer, employee, agent, department, or instrumentality … of any State, municipality, or political subdivision of a State ...." Id. (citing 16 U.S.C. § 1532(13)).

Since experimental populations are treated as threatened species in most circumstances, the red wolf rule must also comply with ESA Section 4(d)'s requirement for special rules "to provide for the conservation of" listed species. 16 U.S.C. § 1533(d); 50 C.F.R. § 17.82. Rules issued pursuant to section 10(j) are "by definition the promulgation of the protective regulations for the species pursuant to the authority of ESA section 4(d)." Defs. of Wildlife v. Tuggle, 607 F. Supp. 2d 1095, 1116-17 (D. Ariz. 2009) (holding that the Service has a non-discretionary duty to ensure that the final rule for reintroduction of Mexican wolves "provides for the conservation" of the species). While "USFWS has discretion to issue the regulations it deems necessary and advisable, [] the regulation *shall* provide for the conservation of such species." Id. (emphasis added) (internal citations and quotations omitted).

## A. Defendants Have Violated ESA Section 9 in Granting Take Authorizations Prohibited by 50 C.F.R. § 17.84(c)

On February 6, 2014, USFWS first invoked 50 C.F.R. § 17.84(c)(4)(v) to authorize private landowner Jett Ferebee to kill a red wolf on his property. [DE 40 ¶ 92]; Pls. App. 938 (Letter from Miranda to Ferebee (Feb. 6, 2014)). According to that provision,

> Any *private landowner* may take red wolves found on his or her property … after efforts by *project personnel* to capture such animals *have been abandoned*, Provided that the Service *project leader or biologist* has approved such actions in writing and all such taking shall be reported within 24 hours to the Service project

leader or biologist, the refuge manager…, or the State wildlife enforcement officer for investigation.

50 C.F.R. § 17.84(c)(4)(v) (emphasis added).  The February 2014 take authorization was renewed twice, each time without evidence that red wolves were currently on the landowner's property, and thus each time without attempting to capture wolves off the property.  Pls. App. 957 (Letter from Benjamin to Ferebee (Sept. 23, 2014)); Pls. App. 998 (Letter from Benjamin to Ferebee (Apr. 27, 2015)).   The February 6, 2014 take authorization and renewals were never acted upon by the landowner.  [DE 40 ¶ 100].  On May 20, 2015, USFWS again invoked this provision to authorize two landowners to take red wolves on their properties, which resulted in the death of a red wolf on June 17, 2015.  Pls. App. 1001 (E-mail from Benjamin to Redacted (May 20, 2015)); Pls. App. 1004-1007 (May 20, 2015 Take Auths.); [DE 40 ¶ 105]; Pls. App. 1009 (E-mail from Benjamin to Beyer et al. (June 18, 2015). Again, these authorizations were granted without the program staff having access to the property and therefore not able to undertake efforts to capture such animals, abandon such efforts, or even confirm red wolf activity on the private lands in question.

The plain language of the regulation states that a take authorization may be granted only after "efforts by project personnel to capture such animals have been abandoned." 50 C.F.R. § 17.84(c)(4)(v).  The May 2015 authorizations make no such finding.  On the contrary, they read

> While we would be happy to attempt to capture and remove this animal you have indicated that you do not wish to provide access to your property.  Given our lack of access to actively trap on the property we conclude that we are foreclosed from pursuing any animals that may be on your land and *in that sense* must abandon efforts to capture and relocate the animals ourselves.

Pls. App. 1005, 1007 (May 20, 2015 Take Auths) (emphasis added).  An essential prerequisite to the granting of a take authorization has not been met in this case as "efforts by project personnel" must surely be *initiated* before they can be *abandoned*.  The authorizations further state "[w]e

have no direct evidence of any other wolves using your property," and instead notes that the landowner's previous trapping efforts and the fact that the property "is located near a National Wildlife Refuge on which red wolves occur" leave "no doubt that red wolves have used your property and may occur on your property now and in the future." Id. To simply infer the presence of red wolves in this way, and to "deem" efforts abandoned when they have never been initiated renders meaningless the specific limitations written into this take exception.

In addition, any take authorization must be issued in writing by "the Service project leader or biologist." 50 C.F.R. § 17.84(c)(4)(v). The preamble to the rule further clarifies that this decision must be made "*on site of the depredation*." Endangered and Threatened Wildlife and Plants; Revision of the Special Rule for Nonessential Experimental Populations of Red Wolves in North Carolina and Tennessee, 60 Fed. Reg. 18,940, 18,943 (Apr. 13, 1995) (to be codified at 50 C.F.R. pt. 17) (emphasis added). Here, there is no evidence that there was a depredation or any other problem caused by the wolf that was killed, and the Service's written take authorization was certainly not granted on site, or even after a site investigation. As with the other carefully worded elements of this rule that restrict the take of red wolves in order to provide for the conservation of the species, these requirements again reflects the notion that not every take request from a landowner will be granted, but rather must be made consistent with strict limitations that codify the ESA's policy of conserving the species. Rather than being granted by the program staff with the best knowledge of the wolves, the first take authorization in the history of the program was issued by Assistant Regional Director Miranda, located in

Atlanta, Pls. App. 938, and the May 2015 authorizations were issued by Field Supervisor Benjamin, located in Raleigh. Pls. App. 1004-1007. [3]

The Fourth Circuit and this Court have characterized the red wolf regulations found at 50 C.F.R. § 17.84(c) as "expressly extend[ing] the prohibition on taking under Section 9 to the experimental red wolf population, *subject to certain exceptions*." RWC I at *6 (emphasis added) (citing Gibbs v. Babbitt, 214 F.3d 483, 488 (4th Cir. 2000)). Any take that does not fall within one of these limited exceptions, is illegal take in violation of the ESA. 16 U.S.C. § 1538(a)(1)(G). Indeed, in RWC I, this Court carefully examined the red wolf rule and determined that North Carolina's authorization of coyote hunting did not meet any of these limited exceptions. See RWC I at * 8 (finding that WRC authorization of coyote hunting did not qualify for "reasonable due care" exemption). Here, the USFWS's take authorizations clearly fall outside of the limited exceptions specified in the regulations.

Based on the evidence before the Court, only one red wolf has thus far been killed pursuant to a 50 C.F.R. § 17.84(c)(4)(v) lethal take authorization, yet the multiple take authorizations *issued* to landowners demonstrate that further illegal take is likely. Pls. App. 938, 957, 998. Various Service memoranda outlining Service procedures further spell out the Service's intent to continue to issue lethal take authorizations under similar circumstances. Pls. App. 962-63 (Procedures for Responding to Landowner Requests (Sept. 2014)); Pls. App. 975,

---

[3] It is also undisputed that the red wolf that was killed on June 17, 2015, was killed by a shared agent of the landowners rather than either of the two landowners who received take authorizations for their properties. Pls. App. 42-43 (Harrison Depo 194:09-195:04; 195:15-196:04); Pls. App. 1001. While other provisions of the red wolf rule allow for take by "[a]ny person" see id. §§ 17.84(c)(4)(i) and (ii), or "[a]ny private landowner, or other individual having his or her permission" see id. §§ 17.84(c)(4)(iii) and (iv), the take authorizations at issue here were granted under § 17.84(c)(4)(v), which is strictly limited to "private landowner[s]." The agency again ignored the explicit requirements of the rule when it responded immediately that this was not unlawful take. Pls. App. 1015 (E-mail from Benjamin to Redacted (Jun. 19, 2015)).

977 (Memo from Dohner (Feb. 24, 2015)); Pls. App. 1021-22 (Regional Interpretation of 'Take' (June 30, 2015)). In addition, despite this Court's injunction in September 2016, the USFWS website *still* states that the agency will continue to remove red wolves from private lands and that "[p]rivate landowners [] will be allowed to take animals when authorized by a permit in accordance with our regulation." Pls. App. 1221 (USFWS, *Red Wolf Recovery Program Questions and Answers*, https://www.fws.gov/redwolf/faq.html (last visited Mar. 11, 2018)). Yet, as described above, the previous take authorizations have not been in accordance with the Service's regulation. USFWS is imminently likely to cause the illegal take of red wolves and should be permanently enjoined from granting lethal take authorizations that do not comply with the strict requirements of 50 C.F.R. § 17.84(c)(4)(v). See Animal Welfare Inst. v. Beech Ridge Energy LLC, 675 F. Supp. 2d 540, 563 (D. Md. 2009) (plaintiff need only establish "by a preponderance of the evidence" that the challenged action is "reasonably certain to imminently harm, kill, or wound the listed species").

### B. Defendants Have Violated ESA Section 4(d) by Failing to Provide for the Conservation of the Red Wolf

In addition to USFWS's direct violation of 50 C.F.R. § 17.84(c)(4)(v), the agency has also reinterpreted 50 C.F.R. §§ 17.84(c)(4)(v) and (c)(10) in a manner detrimental to red wolf conservation in violation of ESA Section 4(d), 16 U.S.C. § 1533(d). As detailed in USFWS documents, this question of red wolf conservation was the guiding principle for the Red Wolf Program from 1999 until 2014, and caused the agency to focus on removing only those animals that were demonstrated to be "problem animals." This interpretation was essential to providing for the conservation of the species, especially in light of the threat posed by hybridization with coyotes and the risk posed by removing red wolves that could be replaced by coyotes. Yet, in 2014, after the move of the Red Wolf Program from management at Alligator National Wildlife

Refuge to Ecological Services, interpretation and implementation of 50 C.F.R. § 17.84(c) changed dramatically. The 2014 decision to no longer follow the 1999 Guidelines which had governed USFWS practice for fifteen years has modified 50 C.F.R. § 17.84(c) such that it no longer provides for the conservation of the species. See Defs. of Wildlife v. Tuggle, 607 F. Supp. 2d at 1115 ("While an interpretive rule lacks the formal force of law, as a practical matter it affects the regulatory practices of an agency or the expectations of a regulated entity as to what a law or regulation means and how it will be enforced.").

Following the 2014 issuance of the first ever landowner take authorization, landowner requests to have wolves removed or, in the alternative get take authorizations, skyrocketed. Pls. App. 949 (E-mail from Benjamin to Miranda et al. (Sept. 2, 2014), Pls. App. 233 (Benjamin I Depo 124:16-22); Pls. App. 951 (E-mail from Beyer to Benjamin (Oct. 30, 2014). The Service admits these were likely part of coordinated campaign. Pls. App. 955 (E-mail from Beyer to Miranda (Jul 9, 2014)); Pls. App. 256-57 (Benjamin II Depo 128:15-129:10). Yet the Service abandoned its own conservation based guidelines used to respond to such requests for nearly the entire history of the program and instead decided to honor all requests, regardless of their impact on conservation. As noted in the 1999 guidelines, the plain language of (c)(10) states that landowner requests will be honored "if possible," and that not all requests will be possible to honor consistent with the ESA.

Dropping the distinction between problem and non-problem wolves undercuts conservation efforts, as does responding to requests without concern for their impact on other members of the population. In granting the May 2015 take authorization, USFWS staff noted that there was evidence that the wolf ultimately shot had shown signs of denning and could have young puppies, Pls. App. 1009 (E-mail from Benjamin to Beyer et al. (June 18, 2015)),

indicating that the authorized take of this one red wolf could result in the take of more members of this species, in violation of 50 C.F.R. § 17.84(c)(4)(v). Disrupting pack dynamics in this way can result in multiple types of take that have much more far reaching consequences for the red wolf population than responding to a single landowner.

The Service's current blanket approach to granting landowner removal requests and take authorizations is in direct conflict with the will of Congress in defining the requirements of the ESA. Service staff stated as much in several memos from 1998 and 1999. Pls. App. 731 ("removal of wolves in the absence of a problem may be detrimental to the conservation of the species"); Pls. App. 720 ("concerns about the effect such removals may have on our ability to recover this species"); Pls. App. 723 ("it is not possible to recapture, remove, and keep these wolves off a tract of land"); Pls. App. 728 (regulations are "not in line with traditional wildlife management concepts, that are probably the most lenient regulations for taking any endangered species, and that are not in agreement with other wolf reintroduction projects.").

While the Service has made no formal changes to 50 C.F.R. § 17.84(c), the agency's implementation of the regulation in recent years has created an entirely new regulatory scheme. This Court should reject the agency's improper revision of its rules, which undermines the very purpose for which the regulation was written. In its place, the agency's longstanding interpretation that provided for the conservation of the wild red wolf should be resurrected.

## II.  DEFENDANTS HAVE FAILED TO MEET THEIR AFFIRMATIVE DUTIES TO CONSERVE RED WOLVES IMPOSED BY SECTION 7 OF THE ESA.

In addition to the prohibitions imposed on all persons by ESA Section 9 and extended to the red wolf by ESA Section 4(d) and 50 C.F.R. § 17.84(c), Section 7 of the Act imposes additional *affirmative* duties on federal agencies. See TVA v. Hill, 437 U.S. at 180. Section 7(a)(1) directs all federal agencies to "utilize their authorities in furtherance of the purposes of

[the ESA] by carrying out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1). "The terms 'conserve', 'conserving', and 'conservation' mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," i.e., the recovery of the species. 16 U.S.C. 1532(3). Section 7(a)(2) of the ESA further requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(2). This provision applies to experimental populations "when [they] occur[] in an area within the National Wildlife System." 16 U.S.C. § 1539(j)(2)(C)(i). Both of these duties are to be "carried out in consultation with and with the assistance of the Secretary." See 16 U.S.C. §§ 1536(a)(1), (2).

As discussed in Section I, the Service has expanded the capturing and killing of endangered red wolves contrary to the conservation needs of the red wolf. In addition, it has terminated long-standing management measures essential to the species' conservation in the wild. Of particular concern, the USFWS quietly ended its practice of reintroducing captive born red wolves into the wild after its last documented release in 2013. See e.g., Pls. App. 596 (3rd Quarter Report, April – June 2013); Pls. App. 136-37 (Beyer Depo 174:25-175:19); Pls. App. 227-28 (Benjamin I Depo 89:11-90:11). In its 2007 status review, the agency noted that pup fostering had "developed as a significant and useful population management tool in red wolf recovery" and that 20 red wolf pups had been released into the wild population in the previous five years. Pls. App. 470 (2007 Status Review). Also in 2014, the USFWS quietly ended its practice of sterilizing coyotes to prevent hybridization. Pls. App. 22-24 (Harrison Depo 95:24-97:03); Pls. App. 223-25 (Benjamin I Depo 83:06-85:06). This practice had been used effectively

since the development of the Red Wolf Adaptive Management Plan in 1999 to keep the coyote introgression rate into the red wolf genome at less than 4%. Pls. App. 894 (Gese & Terletzky, (2015)); Pls. App. 742-43 (Vucetich Expert Rep. at 9-10); Pls. App. 775 (Benjamin Rebuttal Expert Rep. at 8). Both of these changes were formally announced in 2015. Pls. App. 970-71 (USFWS June 30, 2015 News Release); [DE 32-3 ¶16].

Red wolf program biologists, scientists hired by the Service to study the program, and independent scientists have all warned of the negative consequences terminating coyote sterilization and red wolf releases are likely to have for red wolf conservation. Pls. App. 225-26 (Benjamin I Depo 85:07-86:11); Pls. App. 139-41 (Beyer Depo 179:04-181:03); Pls. App. 734-35, 743, 750 (Vucetich Expert Rep. at 1, 10, 17; Pls. App. 1215-16 (PVA Author Letter (Oct. 11, 2016)); Pls. App. 22-23 (Harrison Depo 95:24-96:16). As discussed in the 2016 PVA, insuring red wolf reproduction in the wild is critical to red wolf recovery. Under current management, the PVA found that the red wolf could go extinct in as few as 8 years. Pls. App. 1117 (Population Viability Analysis). However, the reintroduction of 3 wolves per year could significantly change that trajectory. Id.; Pls. App. 1142. Encouraging red wolf breeding by sterilizing coyotes and preventing hybridization could also change that trajectory. Pls. App. 1133, 1142; see also Pls. App. 745 (Vucetich Expert Report) ("it appears that if the FWS's adaptive management practices are not resumed, the wild population of red wolves will almost certainly go extinct"); Pls. App. 750 ("releasing red wolves from the captive population into the wild population is essential, at this time and given the dire circumstances, for red wolf recovery").

As this Court already found in granting Plaintiffs' Motion for Preliminary Injunction, "the Service's actions after 2014 in regard to its management of the wild red wolf population fail

to adequately provide for the protection of red wolves and may in fact jeopardize the population's survival in the wild in violation of Sections 4 and 7 of the ESA." See RWC II at 804.

**A. Defendants Have Violated ESA Section 7(a)(1) by Failing to Provide for the Conservation of Red Wolves in Violation of ESA Section 7(a)(1).**

It is undisputed that the USFWS is allowing no discretion to red wolf program biologists about whether to remove wolves or authorize their lethal take. It is undisputed that the USFWS has also terminated its previous practices of reintroducing red wolves from the captive population into the wild and of sterilizing coyotes in the red wolf recovery area. Pls. App. 970-71 (USFWS June 30, 2015 News Release); [DE 32-3 ¶16]. Finally, it is also undisputed that these practices were successful in bolstering the red wolf population and preventing hybridization with coyotes, respectively. Pls. App. 65, 67, 110, 266 (Beyer Depo 64:15-18, 66:14-20, 138:07-10, 266:13-226:25); Pls. App. 775 (Benjamin Expert Rep.); Pls. App. 500-01 521 (2007 Status Review); Pls. App. 608-09 (Stoskopf et al. (2005)). Since these programs were terminated, the red wolf population has declined precipitously and scientists have warned of its impending extinction. See, e.g., Pls. App. 1117, 1142 (Population Viability Analysis); Pls. App. 1215-16 (PVA Team Letter (Oct. 11, 2016)); Pls. App. 739-40, 753 (Vucetich Expert Rep.). By terminating these programs and failing to replace them with any comparable conservation measures, the USFWS is violating Section 7(a)(1).

The Eleventh Circuit found in Florida Key Deer v. Paulison, 522 F.3d 1133, 1146-47 (11th Cir. 2008), "while agencies might have discretion in selecting a particular program to conserve—an issue we do not decide here—they must in fact carry out a program to conserve, and not an 'insignificant' measure that does not, or is not reasonably likely to, conserve endangered or threatened species." (internal quotations omitted); see also Sierra Club v. Glickman, 156 F.3d 606, 615-616 (5th Cir. 1998) (discussing Section 7 legislative history in

affirming the procedural and substantive mandates of section 7(a)(1)). "Where there is total inaction, the courts have no trouble finding a violation of section 7(a)(1) because the agency has impermissibly read out of existence its substantive requirement to use the agency's authorities by carrying out programs for the conservation of endangered and threatened species." Defs. of Wildlife v. U.S. Fish & Wildlife, 797 F. Supp. 2d 949, 960 (D. Ariz. 2011).

The key conservation measures for red wolves since their reintroduction in North Carolina have been the sterilization of coyotes within the recovery area and the reintroduction of red wolves from the captive population to augment the wild population.  Pls. App. 740-45, 748-50, 753 (Vucetich Expert Rep.); Pls. App. 65, 67, 110, 266 (Beyer Depo 64:15-18, 66:14-20, 138:07-10, 266:13-226:25).  The USFWS has terminated these measures at the same time as it has interpreted the red wolf rule to allow red wolf program biologists no discretion in whether to remove wolves from private lands or provide lethal take authorizations to private landowners. While the agency may argue that it is "reevaluating" the program – and has been for the past three years -- a federal agency "ha[s] a continuing obligation under Section 7(a)(1) to carry out conservation measures until conservation [is] no longer necessary."  Ctr. for Biological Diversity v. Vilsack, 276 F. Supp. 3d 1015, 1031 (D. Nev. 2017) (finding that USDA violated 7(a)(1) by terminating its program for the conservation of the southwestern willow flycatcher).  Service promises of future action either to conserve or terminate the red wolf reintroduction do not relieve the agency of its legal obligations that currently exist.

This Court has rejected a reading of the ESA that would make "Congress' mandated protection of the red wolf [] nothing more than a half-hearted attempt to 'see what happens' after a few red wolves have been reintroduced into the wild." RWC I  at *8.  The Court found there:

> by designating the red wolf as protected and dedicating funding and efforts for
> more than twenty-five years in a program to rehabilitate the once-nearly

extinct species, Congress has repeatedly demonstrated that it has chosen to preserve the red wolf—not simply to let inaction determine its fate—and it is not for this Court to permit activities that would have an effect counter to this goal.

Id. (citing Gibbs v. Babbitt, 214 F.3d 483, 496 (4th Cir. 2000).

The Service is taking exactly the "half-hearted" approach the Court rejected in that case.

Because the Service is not currently undertaking any significant actions to conserve the only wild

population of red wolves, it is violating its affirmative obligation under ESA Section 7(1)(1).

See Fla. Key Deer v. Paulison, 522 at 1146-47. See Pls. App. 734 (Vucetich Report).

## B. Defendants Have Violated ESA Section 7(a)(2) by Failing to Ensure that Their Actions Are Not Likely to Jeopardize the Continued Existence of Red Wolves.

The Service has also violated both the procedural and substantive requirements of ESA

Section 7 for its actions in significantly modifying the red wolf recovery program.[4]

> [S]ection 7(a)(2) imposes two obligations upon federal agencies. The first is procedural and requires that agencies consult with the [FWS and NMFS] to determine the effects of their actions on endangered or threatened species and their critical habitat. The second is substantive and requires that agencies insure that their actions not jeopardize the endangered or threatened species or their critical habitat.

Fla. Key Deer v. Paulison, 522 F.3d at 1138 ("At the heart of this dispute, and of Congress's plan

to preserve endangered and threatened species, is section 7 of the ESA, which places affirmative

obligations upon federal agencies."); see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife,

551 U.S. 644, 662 (2007) (noting that the "imperative" nature of Section 7's "mandate is to be

carried out through consultation and may require the agency to adopt an alternative course of

action").

---

[4] Section 7(a)(2) applies to the experimental red wolf population because the red wolf population "occurs in an area within the National Wildlife Refuge System" 16 U.S.C. § 1539(j)(2)(C)(i). See Pls.' Stmt. of Facts ¶¶ 8-12.

Formal consultation is required if the action "may affect" a listed species. 50 C.F.R. § 402.14(a). "Any possible effect [to listed species], whether beneficial, benign, adverse, or of an undetermined character," triggers this requirement. Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19,926, 19,949 (Jun. 3, 1986) (to be codified at 50 C.F.R. pt. 402). "If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible." Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985); see also Greenpeace v. Nat'l Marine Fisheries Serv., 106 F. Supp. 2d 1066, 1072 (W.D. Wash. 2000) ("In the absence of a completed comprehensive biological opinion [the action agency] has not, and cannot, insure that [the action] will not result in harm to endangered [species].").

The Service has failed to undergo consultation to insure that its actions are "not likely to jeopardize the continued existence" of the red wolf. According to the definition of "action," consultation should occur on "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02 (listing "actions intended to conserve listed species or their habitat" and "the promulgation of regulations" as examples). The Service did not undergo consultation when the agency decided in 2014 to begin granting lethal take authorizations or expanding its removal of wolves from private lands, nor when it terminated red wolf releases and coyote sterilization—yet it should have, since these actions not only "may affect," but have in fact have significantly harmed the red wolf.

If the agency had undergone Section 7 consultation, it would have been required to develop a biological opinion based that specifies the impacts of these actions on the red wolf. See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. This biological opinion would have to be

based on the best available science, include a statement of the incidental take expected to result, and include reasonable and prudent measures necessary to minimize such impact. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Moreover, the Service likely would have found that its recent actions "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species. 50 C.F.R. § 402.02. Indeed, the removal of individual red wolves from a population of only 22 known animals certainly reduces red wolf numbers such that the likelihood of both the survival and recovery of the red wolf in the wild is impacted. The removal of individual red wolves also affects the reproduction and distribution of the wild red wolf population. The termination of red wolf releases and coyote sterilization similarly affect the wild red wolf population's likelihood of survival and recovery in these ways.

This is especially true in light of the catastrophic decline the population has suffered since 2015. The Service was required to consider its changed management of the wild red wolf population in light of this new information regarding the status of the species to determine whether its revised interpretation of 50 C.F.R. § 17.84(c), its termination of coyote sterilization, and its termination of red wolf releases was likely to jeopardize the continued existence of the remaining 50 red wolves in the wild. By not doing so, the Service has violated both the procedural and substantive duties under ESA Section 7(a)(2).

III. **DEFENDANTS HAVE FAILED TO FOLLOW REQUIRED PROCEDURES TO PROVIDE FOR THE CONSERVATION AND RECOVERY OF THE ENDANGERED RED WOLF.**

### A. Defendants Have Violated NEPA

As described above, the Service has effectively rewritten the red wolf rule, dramatically expanding the circumstances in which wolves will be removed from private land, as well as those in which private landowners will be authorized to kill wolves on their property. This

rewrite is not merely administrative, but goes to the heart of the protections afforded to the endangered red wolf. See, e.g., Gibbs v. Babbit, 214 F.3d at 487 ("The cornerstone of the statute is section 9(a)(1), which prohibits the taking of any endangered species without a permit or other authorization."). At the same time, other circumstances critical to the effect of the red wolf rule on the wild red wolf population have also changed significantly—most notably, the ending of red wolf reintroductions, the ending of adaptive management, and the significant decline in the wild red wolf population. Either the informal rewriting of the red wolf rule or the catastrophic decline in the red wolf population would be sufficient to warrant re-evaluation of the red wolf rule under NEPA, but here those factors come together. Defendants have violated fundamental procedural safeguards intended to ensure that agency action is informed, based on the best available science, and subject to public scrutiny. Thus, their revision to the red wolf rule is invalid.

NEPA's sweeping commitment is to "prevent or eliminate damage to the environment and biosphere by focusing [g]overnment and public attention on the environmental effects of proposed agency action." Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 371 (1989) (internal quotation marks omitted) (citing 42 U.S.C. § 4321). NEPA's analysis and disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to guarantee that relevant information is available to the public and other government agencies that play a role in the decisionmaking process. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1150-52 (9th Cir. 1998), overruled on other grounds by The Lands Council v. McNair, 537 F.3d 981 (2008); W. Land Exch. Project v. U.S. Bureau of Land Mgmt., 315 F. Supp. 2d 1068, 1086 (D. Nev. 2004). By focusing the agency's attention on the environmental consequences of its proposed action, NEPA "ensures that important effects will not be overlooked or

underestimated only to be discovered after resources have been committed or the die otherwise cast." Robertson, 490 U.S. at 349.

NEPA is required for ESA special rules like that which applies to the red wolf. See In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig., 818 F. Supp. 2d 214, 238 (D.D.C. 2011) ("The Service erred when it failed to conduct any NEPA review prior to issuing its Special Rule for the polar bear."). The Service completed an EA when it issued the original red wolf rule. Indeed, the "significance" factors articulated in the Council on Environmental Quality regulations direct agencies to consider, among other factors, "[t]he degree to which the action may adversely affect an endangered or threatened species" under the ESA, 40 C.F.R. § 1508.27(b)(9), "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration" id. at § 1508.27(b)(6); and"[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," id. at § 1508.27(b)(4). "An action may be 'significant' if one of these factors is met." Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1220 (9th Cir. 2008); see also Steamboaters v. F.E.R.C., 759 F.2d 1382, 1393 (9th Cir. 1985) (an agency "must supply a convincing statement of reasons why potential effects are insignificant.") An agency does not receive deference in its determination of whether or not NEPA applies to its actions. See In re Polar Bear, 818 F. Supp. 2d at 226. According to the Council of Environmental Quality's guidance on NEPA and its regulations, "[a]n EIS must be prepared if an agency proposes to implement a specific policy" if the policy will have significant environmental effects. Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,033 (March 23, 1981) (to be codified at 40 C.F.R. pts. 1500-8).

While the agency has not revised the text of its regulations, the unexplained policy revision it has undertaken yields effectively the same result. The Service has now reversed course from the 1999 Guidelines it followed in implementing the red wolf rule with conservation and recovery in mind, changing its long-standing reading and implementation of the regulations. See Wheeler Decl. ¶ 16. The Service's complete reversal in its long-standing position without disclosing it or explaining it violates NEPA. See generally, N.Y. Pub. Interest Research Grp., Inc. v. Johnson, 427 F.3d 172, 182-83 (2d Cir. 2005) (agency needed to explain its "180 turn" in position about necessary components for Clean Air Act permits); Sierra Club N. Star Chapter v. LaHood, 693 F. Supp. 2d 958, 973-74 (D. Minn. 2010) (holding that "the agency must explain its reasons for changing its policy.").

Additionally, circumstances have changed significantly since the Service last revised the red wolf rule and program in 1995. 50 C.F.R. § 1502.9(c)(1)(ii). Then, captive red wolves were being reintroduced into the wild population, the population was growing, and the Service was actively managing the population. All of these circumstances have now changes and warrant a new "hard look" at the Service's actions. See Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 443 (4th Cir. 1996) ("NEPA requires agencies to take a hard look at the environmental consequences of their proposed projects even after an EIS has been prepared."); Miccosukee Tribe of Indians of Fla. v. United States, 420 F. Supp. 2d 1324, 1333-34 (S.D. Fla. 2006) (noting that "changes implemented by the Corps could hardly be insignificant" and thus required supplemental NEPA review).

### B. Defendants Have Violated ESA Section 4 by Failing to Complete the Status Review

Under Section 4 of the ESA, USFWS is required to conduct a review of the red wolf's status "at least once every five years" to determine whether its status under the ESA should be

changed. 16 U.S.C. § 1533(c)(2). Such review must be based "solely on the basis of the best scientific and commercial date available." Id. (citing 16 U.S.C.§ 1533(b)(1)(A)). See generally, Humane Soc'y of the United States v. Zinke, 865 F.3d 585, 596 (D.C. Cir. 2017) (describing ESA requirement for 5-year status reviews and that each decision must rely on the ESA listing criteria and the best scientific and commercial data). As courts have repeatedly found, this requirement contemplates action based on the best *available* science, rather than allowing the Service to delay conservation while it studies a species into extinction. See, e.g., Defs. of Wildlife v. Babbitt, 958 F. Supp. 670, 679-80 (D.D.C. 1997) (rejecting delay for conclusive evidence as inconsistent with the ESA's legislative intent of preventative action).

USFWS's most recent red wolf status review was completed in September 2007. Accordingly, USFWS was required to complete a new status review in 2012. Defendants have admitted they are in violation of this requirement. [DE 40 ¶¶ 26, 131, 132]. Indeed, the Service published a Notice of Status Review on Oct. 31, 2016, shortly after this Court granted Plaintiff's Request for Preliminary Injunction. See Endangered and Threatened Wildlife and Plants; 5-Year Status Review of the Red Wolf, 81 Fed. Reg. 75,425 (Oct. 31, 2016). Yet now, nearly a year and a half later, it still has not finalized this essential element of the ESA's statutory scheme.

## IV. THIS COURT SHOULD ENJOIN DEFENDANTS FROM CAUSING JEOPARDY TO THE WILD RED WOLF.

Courts generally retain broad discretion to issue equitable relief. Weinberger v. Romero-Barcelo, 456 U.S. 305, 310 (1982). Under the ESA, however "the purpose and language of the statute" reflect Congress's intent to insure against the likelihood of jeopardy to listed species. Id. at 314-15 (discussing TVA v. Hill, 437 U.S. at 173); Defs. of Wildlife v. Norton, 239 F.Supp. 2d 9, 23 (D.D.C. 2002) ("Defendants fail to cite any language in the legislative history of the ESA

to suggest that Congress intended to limit courts' authority to remedy the Service's violation of its nondiscretionary duties").

In Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 422 F.3d 782, 796 (9th Cir. 2005), the Court found that the district court's grant of injunctive relief was justified to prevent ongoing harm to listed salmon. "One of the primary complications of this case is that the operations in question are by necessity, ongoing." Id. Thus, simply delaying a destructive action was not possible, and the court was required to either continue an ongoing violation of the ESA or make modifications that would cure the violation. Id. at 796-97. Thus, the court relied on expert opinion and agency history to promulgate an appropriate remedy.

The Court in this case should do the same. Left to its own devices, the USFWS will resume the capturing and killing of endangered red wolves enjoined by this Court in 2016. The USFWS will continue its abandonment of wolf reintroductions and coyote sterilization, the two conservation actions most successful in ensuring against the likely extinction of the red wolf in the wild. These actions violate the ESA and will irreparably harm the red wolf. See id. As in Nat'l Wildlife Fed'n, moreover, previous agency practice and documentation provide this Court with the ample guidance for fashioning a remedy. Indeed, had the USFWS conducted the rulemaking, NEPA analysis, and ESA Biological Opinion required by federal law, this Court could simply vacate and remand those final agency actions.

Plaintiffs accordingly request that this Court:

- Maintain the injunction against the capturing and killing of non-problem wolves issued by this Court on September 28, 2016;

- Order the USFWS to within 30 days of an order granting Plaintiffs' Motion for Summary Judgment to either reinstate coyote sterilization and red wolf releases or explain why such action is not necessary to provide for the conservation of the red wolf;

29

- Require that any subsequent modification to the historic implementation of the red wolf rule or the longstanding red wolf adaptive management program go through required analyses under the ESA, NEPA, and the Administrative Procedure Act before they take effect.

These actions are necessary and appropriate to protect the wild red wolf population from the USFWS's efforts to place politics over both science the will of Congress. Quoting the Fourth Circuit in <u>Gibbs v. Babbitt</u>:

> Extinction, after all, is irreversible. If a species becomes extinct, we are left to speculate forever on what we might have learned or what we may have realized. If we conserve the species, it will be available for the study and benefit of future generations. In any event, it is for Congress to choose between inaction and preservation, not for the courts.

214 F.3d at 496.

## **CONCLUSION**

For the reasons discussed above, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment.

Submitted, this the 12th day of March, 2018.

<u>/s/ Sierra B. Weaver</u>
Sierra B. Weaver
N.C. State Bar No. 28340
sweaver@selcnc.org
Derb S. Carter, Jr.
N.C. State Bar No. 10644
dcarter@selcnc.org
Ramona H. McGee
N.C. State Bar No. 47935
rmcgee@selcnc.org

SOUTHERN ENVIRONMENTAL LAW CENTER
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2018, I electronically filed the foregoing

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT** with the

Clerk of the Court using the CM/ECF system, which will automatically send notification of such

filing to counsel for Defendants.

This the 12[h] day of March, 2018.

/s/ Sierra B. Weaver

Sierra B. Weaver