IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:15-CV-42-BO

RED WOLF COALITION, DEFENDERS )
OF WILDLIFE, and ANIMAL )
WELFARE INSTITUTE, )
)
Plaintiffs, )
)
v. ) ORDER
)
UNITED STATES FISH AND WILDLIFE )
SERVICE; JIM KURTH, in his official )
capacity as Acting Director of the United )
States Fish and Wildlife Service; and MIKE )
OETKER, in his official capacity as Acting )
Regional Director of the United States Fish )
and Wildlife Service Southeast Region, )
)
Defendants.[1] )

This cause comes before the Court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The appropriate responses and replies have been filed, and a hearing was held before the undersigned on October 17, 2018, at Raleigh, North Carolina. In this posture, the motions are ripe for ruling.

## BACKGROUND

*Factual[2] and procedural background*

The wild red wolf, or *Canis rufus*, is again close to extinction, with as few as forty wolves identified in the wild in April 2018. [DE 88 at 5]. In 1967, the red wolf was designated as an

---

[1] Jim Kurth and Mike Oetker have been substituted for defendants Daniel M. Ashe and Cynthia Dohner pursuant to Fed. R. Civ. P. 25(d).
[2] The factual background is comprised primarily of public record and undisputed facts as proffered by plaintiffs and reflected in defendants' combined response to plaintiffs' statement of uncontested facts and affirmative statement of uncontested facts. [DE 87]. Plaintiffs' appendices are at [DE 82, 83].

endangered species under the Endangered Species Preservation Act of 1966,[3] and, in 1980, the species was declared extinct in the wild. In 1986, the United States Fish and Wildlife Service (USFWS) instituted a special rule under Section 10 of the Endangered Species Act of 1973 to establish the reintroduction of red wolves in North Carolina, specifically on the Alligator River National Wildlife Refuge in Dare County. *See* 51 Fed. Reg. 41,790 (Nov. 19, 1986); 50 C.F.R. § 17.84.[4] The red wolf was designated as a non-essential experimental population under the Endangered Species Act–experimental status[5] would allow USFWS more discretion in devising an active management program and the non-essential designation was applied because the species was considered to be fully protected in six separate captive locations. *Id.* Four captive-bred pairs of red wolves were released to the Alligator River reintroduction site in 1987. The Red Wolf Recovery Area currently encompasses approximately 1.7 million acres in Dare, Hyde, Tyrrell, Washington, and Beaufort Counties, and includes four national wildlife refuges, a U.S. Air Force bombing range, state-owned, and private lands. *See* 60 Fed. Reg. 18,940.

The red wolf 10(j) rule prohibits the take[6] of a red wolf except in those limited circumstances. 50 C.F.R. § 17.84(c)(2). Intentional or willful takes of red wolves are not permitted in the Red Wolf Recovery Area unless it is in defense of a person's own life or the lives of others; the animal is in the act of killing livestock or pets; or the take has been authorized by USFWS project personnel after efforts by USFWS to capture the animal have been abandoned, provided

---

[3] Pub. L. 89-669, October 15, 1966, 80 Stat. 926, a predecessor to the Endangered Species Act of 1973.
[4] Referred to herein as the 10(j) rule or red wolf rule.
[5] An experimental designation further means that red wolves are treated as threatened, rather than endangered, species for purposes of Sections 4(d) and 9 of the ESA. *See Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000).
[6] "Take" is defined by the ESA to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

2

that the USFWS project leader has approved of the take in writing. *Id.* § (c)(4)(i); (iii); (v). All takes are additionally subject to reporting requirements. *Id.*

From the red wolf recovery program's inception, it was understood that the interaction between red wolves and humans in the Red Wolf Recovery Area would be an issue which would require effective management in order for reintroduction of the species to be successful. *See* Pl. App. 333-357 (USFWS Red Wolf Recovery/Species Survival Plan). To that end, USFWS issued an internal document in January 1999 entitled "Guidelines for Applying the Current Red Wolf Rule (April 13, 1995) to Requests to Remove red wolves from private land." Pl. App. 723. The 1999 Guidelines distinguished between problem wolves and non-problem wolves. Problem wolves are wolves which have engaged in actions that directly caused the loss of personal property and wolves which are exhibiting inappropriate behavior, such as a tolerance of humans, which may suggest the wolf would become a more serious problem. Under the 1999 Guidelines, reports of problem wolves would be addressed by field personnel within forty-eight hours, and problem wolves would be captured and removed if feasible, or authorization to landowners to effect a lethal or non-lethal take would be given. *Id.* Requests to retrieve non-problem wolves from private land, however, would be addressed within manpower limits, and whether traps would be set to capture the non-problem wolf would be subject to certain criteria. *Id.*

The 1999 Guidelines for implementing the red wolf 10(j) rule were drafted in response to continuous requests from two or three private landowners to remove red wolves from their property, in combination with the increase in red wolf population and the logistical and economic difficulties with continuing to try to honor all requests for red wolf removal. Pl. App. 731. USFWS noted that removal of non-problem wolves "may be detrimental to the conservation of the species by preventing natural expansion and recovery of the species, and by contributing to the

3

establishment of coyotes." *Id.*; *see also* Pl. App. 723. In essence, beginning in the late 1990s, USFWS focused efforts on addressing landowner complaints about problem wolves, and shifted away from making efforts to remove every wolf identified on private property. The 1999 Guidelines referenced addressing landowner concerns regarding the presence of non-problem wolves primarily in terms of capture and removal and other non-lethal take methods.

Coyotes were not present in the Red Wolf Recovery Area when the red wolf reintroduction program was initiated. As the presence of coyotes in the area increased in the late 1990s, USFWS implemented an adaptive management work plan to prevent coyote-red wolf interbreeding, which included the sterilization of coyotes in the wild and use of sterile coyotes as placeholders; placeholder coyotes would hold territories as against other coyotes territories until the placeholder territories were taken over by red wolves either naturally or by management action. *See* Pl. App. 500. In 2005, the Red Wolf Recovery Adaptive Work Plan included the dual goals of reducing interbreeding between red wolves and coyotes and building and maintaining the wild red wolf population in the Northeastern North Carolina recovery area. Pl. App. 808-814. Pup fostering, or placing captive-born red wolf pups in the den of wild wolf parents, was determined to be a "significant and useful population management tool in red wolf recovery". Pl. App. 470. In the 2007 Red Wolf 5-year Status Review, Pl. App. 491-548, the reintroduction of red wolves to the Red Wolf Recovery Area was determined to be a "remarkable success," with nearly 130 red wolves in the wild. *Id.* at 523.

"Recall[ing] that wolves were rather easily exterminated from the U.S. during the predator control efforts of the early 20th century, while at the same time the range of the coyote increased," Pl. App. 820, the 2010-2012 Red Wolf Adaptive Management Plan recognized that eliminating the breeding potential of eastern coyotes within the red wolf area would support increasing the red

4

wolf population. Pl App. 820-827. These same goals of reducing coyote interbreeding and increasing the wild red wolf population were repeated in the 2013-2015 Red Wolf Adaptive Management Plan. Pl. App. 846-859. Other than coyote interbreeding, the 2007 Status Report cited human interaction and gunshot mortality as the primary areas of concern for the viability of the wild red wolf population. Pl. App. 523-24.

On February 6, 2014, USFWS issued the first lethal take authorization to a private landowner under 50 C.F.R. § 17.84(c)(4)(v). Pl. App. 938-940. The authorization was in a letter from Leopoldo Miranda, Assistant Regional Director, Ecological Services. Pl. App. 938-940. USFWS renewed the February 2014 take authorization twice – once on September 23, 2014, and again on April 27, 2015.

In September 2014, USFWS noted that, over a period of several weeks, 228 letters requesting that red wolves be removed from private land had been received, Pl. App. 949, and by October 30, 2014, USFWS had received 405 individual requests to remove red wolves from private land. Pl. App. 951. On follow-up from USFWS personnel, however, it was determined that numerous individuals who had signed letters had thought they were signing a coyote hunting petition, while others stated that that they did not have red wolves on their property, or that they did not object to having red wolves on their property; other requests for removal contained no contact information or were duplicate requests from the same address. Pl. App. 949-951.

Citing population decline and growing stakeholder concerns, USFWS hired the Wildlife Management Institute "to conduct an independent evaluation of the Red Wolf Recovery Program that focused on supporting science, program management, and human dimensions." [DE 88 at 11] Miranda-Castro Decl. ¶ 4. On January 29, 2015, the North Carolina Wildlife Resources Commission passed resolutions requesting that defendants declare the red wolf extinct in the wild

in North Carolina and terminate the Red Wolf Reintroduction Program for free-ranging red wolves. Pl. App. 972-74.

Beginning in the winter of 2015, USFWS stopped conducting coyote sterilizations. Pl. App. 23, Harrison Dep. at 96. Releases of red wolves into Eastern North Carolina were also discontinued in 2015, as was pup fostering. Benjamin Dep. at 227-28; *see also* [DE 88 at 271] (June 30, 2015 Press Release: Service Halts Red Wolf Reintroductions Pending Examination of Recovery Program).

A second take authorization was granted by Pete Benjamin, Field Supervisor, to two additional landowners on May 20, 2015, Pl. App. 1006-7, which resulted in the lethal take of a red wolf on June 17, 2015. Pl. App. 1009. The red wolf that was killed was a non-problem, six-year old denning mother. Pl. App. 1013. In June 2015, USFWS issued an internal memorandum providing revised procedures for responding to landowner requests for removal of red wolves. Pl. App. 1020-22. The 2015 procedures provide that lethal take authorizations for specific wolves will be provided to landowners where removed wolves return to the subject property or where reasonable efforts to capture known wolves are unsuccessful. Unlike the 1999 Guidelines, the 2015 procedures do not distinguish between problem and non-problem wolves. *Id.* On June 30, 2015, USFWS publically announced that it would be conducting a "thorough and deliberate evaluation of the red wolf recovery program" and confirmed its commitment to "get[ting] the science right, [and] rebuild[ing] trust with our neighbors . . . state partners and many stakeholders . . .." [DE 88 at 272].

In October 2015, USFWS estimated there were 50-75 red wolves in the wild, and the last publically released population estimate shows an estimated 46-60 red wolves in the wild. Pl. App. 1114. Plaintiffs instituted this action in November 2015, and the Court issued a preliminary

6

injunction preventing the take of non-problem wolves on September 28, 2016. As of November 2017, as few as two or three breeding pairs of red wolves remain in the wild population. Pl. App. 258-59, Benjamin Dep. II at 145-46.

In May 2017, USFWS published an advance notice of its intent to develop a proposed rule, prepare a NEPA document, and convene two public scoping meetings. Miranda-Castro Decl. ¶ 7. USFWS completed a five-year status review of the red wolf on April 23, 2018, and intends to finalize its NEPA document and to either finalize or withdraw its proposed rule by November 30, 2018. *Id.* ¶¶ 9, 12, 13. During the rule-making process, USFWS states that it is continuing to actively manage the red wolf population by monitoring radio-collared red wolves; using remote sensing cameras and scent stations to assess movement, pack dynamics, and the general health of the wolves; and by using captive red wolves for educational purposes. *Id.* ¶ 14.

## *Plaintiffs' claims*

Plaintiffs' amended complaint alleges that defendants have violated the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, as follows: that defendants have violated Section 9 by authorizing private take of red wolves without satisfying the requirements of 50 C.F.R. § 17.84(c)(4)(v); that defendants have violated Section 4 by administering the red wolf rule in a manner that is failing to provide for the conservation of red wolves; that defendants have violated Section 4 by failing to conduct the mandatory five-year status review of the red wolf species; and that defendants have violated Section 7 by failing to administer the red wolf recovery program in furtherance of the conservation purposes of the ESA and by failing to ensure that administration of the red wolf recovery program pursuant to 50 C.F.R. § 17.84(c) is not likely to jeopardize the red wolf's continued existence. [DE 20] Amd. Cmpl. ¶¶ 114-145. Plaintiffs further allege that defendants have violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-47,

by modifying their administration of the red wolf rule without completing an environmental assessment or environmental impact study. Amd. Cmpl. ¶¶ 146-151. At bottom, plaintiffs challenge defendants' actions in authorizing the lethal or non-lethal take of red wolves on private land without first satisfying the requirements of the governing regulations and in shifting their efforts and administering the red wolf rules and regulations in a manner resulting in a failure to provide for the conservation of the wild red wolf population.

DISCUSSION

In their motion for summary judgment, plaintiffs asks this Court to find that defendants are violating and will continue to violate the ESA and its implementing regulations as well as NEPA. Plaintiffs further request that the Court, pursuant to its equitable authority: maintain the injunction against the capturing and killing of non-problem wolves as issued by the Court as a preliminary injunction; order the USFWS to, within thirty days of the date of entry of this order, reinstate the coyote sterilization program and red wolf releases or explain why such action is not necessary for the conservation of the red wolf; and require that any subsequent modification to the historic implementation of the red wolf rule or the longstanding red wolf adaptive management program go through the required analysis under the ESA, NEPA, and the Administrative Procedures Act before they take effect.

In response, defendants argue that, due to recent changes to management of the red wolf population, plaintiffs' claims are moot and the Court lacks subject matter jurisdiction to consider them. Defendants further argue that, if plaintiffs' claims are not found to be moot, the USFWS' actions regarding the red wolves comply with the ESA and NEPA; defendants also contend that plaintiffs' request for mandatory injunctive relief must be denied because it lacks any basis in law or equity.

I. Standard of review

Generally, a motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under the Administrative Procedures Act (APA), 5 U.S.C. § 702, which the Court has previously determined applies to plaintiffs' claims, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Thus, when reviewing agency action under APA, a court does not consider whether there are disputed issues of material fact, but rather must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

Under the APA, agency action shall be set aside by a reviewing court if its "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Courts must conduct a 'searching and careful' inquiry into the agency decision, although this review is ultimately a 'narrow' one." *J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1146 (E.D. Va. 1995) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Review of agency action under the APA is highly deferential, *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009), but a court must be mindful not to rubber-stamp agency decisions, as doing so would abdicate the judiciary's responsibility under the Act. *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000) (citation omitted). Agency action must be deemed arbitrary and capricious where the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of

9

the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

II. Mootness

As it concerns a threshold inquiry, the Court considers first defendants' argument that the Court now lacks subject matter jurisdiction over this case because plaintiffs' claims are constitutionally or prudentially moot.

Article III of the United States Constitution limits federal court jurisdiction to actual "cases" and "controversies" and requires that a dispute remains "live"; litigants must maintain a "personal stake" in the outcome throughout the course of litigation. *U.S. Parole Comm' n v. Geraghty*, 445 U.S. 388, 395– 96 (1980). "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* at 397 (quotation omitted). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). A federal court lacks subject matter jurisdiction to decide a case which is moot due to Article III's case or controversy requirement. *Com. of Va. ex rel. Coleman v. Califano*, 631 F.2d 324, 326 (4th Cir. 1980).

The doctrine of prudential mootness permits a court to, in its discretion, decline to enter injunctive and declaratory relief where the court can no longer provide an effective remedy and it would be imprudent to decide the case. *S-1 v. Spangler*, 832 F.2d 294, 297 (4th Cir. 1987); *Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 706 (D. Md. 2008). In deciding whether issues have become prudentially moot, courts consider three factors: whether the specific relief

sought no longer has sufficient utility to justify a decision on the merits; the difficulty and sensitivity of the core issues in the case; and finally whether the challenged acts are capable of repetition yet likely to evade review. *Spangler*, 832 F.2d at 297-298; *see also Smyth v. Carter*, 88 F. Supp. 2d 567, 571 (W.D. Va. 2000). If a case or claim is determined to be prudentially moot, a court may avoid deciding the constitutional question of Article III mootness. *United States v. Under Seal*, 757 F.2d 600, 602 (1985); *Smyth*, 88 F. Supp. 2d at 570.

Defendants argue first that plaintiffs' third claim for relief, which seeks the undertaking of a five-year review of the red wolves as required by Section 4 of the ESA, 16 U.S.C. § 1533(c)(2), is constitutionally moot. The last five-year Section 4 species review had occurred in 2007, and, at the time of the filing of plaintiffs' complaint in 2015, no five-year review had been conducted since that time. Defendants assert that a new species status assessment of the red wolf was completed on April 19, 2018, and a five-year status review was completed on April 23, 2018. As the Court could not order defendants to conduct the Section 4 five-year review because it was conducted in April 2018, the Court, in its discretion, finds that its inability to order an effective remedy has rendered this claim prudentially moot. The Court need not, therefore, consider the constitutional question and plaintiff's third claim for relief is dismissed.

As to plaintiffs' remaining claims, the doctrine of prudential mootness is not applicable. Defendants argue[7] that because they have undertaken new rulemaking, and anticipate that a new red wolf 10(j) rule will be final by November 30, 2018, plaintiffs' claims which are based on the current 10(j) rule are moot. However, the claims before the Court are not particularly sensitive or difficult, and the specific relief sought by plaintiffs continues to have utility – while defendants have initiated the proposed rulemaking process, and *contend* that they will have a final rule in

---

[7] Defendants argue only that plaintiffs' remaining claims are prudentially moot.

11

place by November 30, 2018, there is no impediment to this Court enjoining defendants or providing declaratory relief pending publication of a final rule. *See Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 111 (D.D.C. 2011) (request to prevent agency action until ESA Section 7 consultation has been completed not moot where consultation has been initiated during pendency of case). Because the "conclusion of the [rulemaking] process . . . lies somewhere in the [] future" plaintiffs' remaining claims are not prudentially moot and the Court will consider them on the merits. *W. Virginia Highlands Conservancy v. Norton*, 161 F. Supp. 2d 676, 680 (S.D.W. Va. 2001).

III. Analysis

Plaintiffs' ESA Section 9 claim relates to the grant of two lethal take authorizations under 50 C.F.R. § 17.84(c)(4)(v). It is well-established that "an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. Envtl. Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation and citation omitted); *see also Steenholdt v. Fed. Aviation Admin.*, 314 F.3d 633, 639 (D.C. Cir. 2003) (federal agencies must follow own rules). The take authorizations issued in 2014 and 2015 failed to comply with the red wolf 10(j) rule, and therefore violated Section 9 of the ESA. *See Gibbs v. Babbitt*, 214 F.3d 483, 488 (4th Cir. 2000) (Section 9 take prohibition extended to experimental red wolf populations subject to exceptions). The take authorizations were issued under 50 C.F.R. § 17.84(c)(4)(v), which provides that:

> Any private landowner may take *red wolves* found on his or her property in the areas defined in paragraphs (c)(9)(i) and (ii) of this section *after* efforts by project personnel to capture such animals have been abandoned, *Provided* that the Service project leader or biologist has approved such actions in writing and all such taking shall be reported within 24 hours . . . .

50 C.F.R. § 17.84(c)(4)(v) (some emphasis added).

12

Contrary to defendants' arguments, the take authorizations failed to comply with the plain language of the red wolf 10(j) rule, which requires that red wolf take authorizations for a private landowner be approved "after efforts by project personnel to capture such animals have been abandoned." The February 2014 take authorization refers to unconfirmed canids[8] on the subject property, the extent of whose use of the property was also unconfirmed. The May 2015 take authorization cites no direct evidence of wolves on the subject property. However, in both authorizations, after noting that the properties are adjacent to a National Wildlife Refuge on which red wolves are known to occur, USFWS states that, in light of staffing commitments and lack of access to trap on the subject property, USFWS was foreclosed from pursuing animals that may be on the subject land "and *in that sense* must abandon efforts to capture and relocate the animal ourselves." *See* Pl. App. 939 (emphasis added).

The 2014 and 2015 take authorizations were issued because landowners had refused to give USFWS access to continue trapping or engaging in other efforts. Abandonment of USFWS efforts based on a landowner's refusal to grant USFWS access to their property cannot serve as a proper basis for issuing a lethal take authorization under § 17.84(c)(4)(v), as doing so would impermissibly tip the scales in favor of public demand and away from USFWS' congressionally mandated goal to recover and rehabilitate the red wolf in the wild. In addition to requiring USFWS to *actually* abandon attempts to capture red wolves on private land prior to issuing a take authorization, the red wolf 10(j) rule contemplates that USFWS would have abandoned efforts to capture *specific* red wolves prior to issuing a take authorization. The 2015 take authorization, for example, plainly states that USFWS has not even confirmed the presence of a red wolf on the

---

[8] Canid is defined as "any of a family (Canidae) of carnivorous animals that includes the wolves, jackals, foxes, coyote, and the domestic dog." https://www.merriam-webster.com/dictionary/canid (last visited October 30, 2018).

13

subject property. USFWS' expansive reading of the circumstances which would support issuing a take – including lethal take – authorization to a private landowner under the red wolf 10(j) rule impermissibly broadens the scope of wolves subject to take authorizations, and therefore conflicts with the ESA's "purpose to protect endangered and threatened" species. *Hill v. Coggins*, 867 F.3d 499, 510 (4th Cir. 2017) (quoting *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 700 (1995)).

While the Court must afford deference to USFWS' construction of its 10(j) rule, where, as here, its interpretation operates against the USFWS' goal to recover the red wolf in the wild, the agency's "disregard for the statutory and regulatory context deserves no deference." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931 (9th Cir. 2008). The take authorizations are further at odds with at least one USFWS scientist with the Red Wolf Recovery Program, who noted on several occasions that "our understanding [is] that foreclosure to access does not equate to abandonment of effort". Pl. App. 968 (Nov. 20, 2014 email from Beyer to Benjamin); Pl. App. 991 (Mar. 19, 2015 email from Beyer to Benjamin) ("My understanding is we would have to issue a permit after attempts to remove wolves have been abandoned. In this case we are not even recognizing or aware of any wolves present, have not made any capture efforts, and have denied similar requests.").

The 2014 and 2015 take authorizations represent a departure from long-standing USFWS guidelines to issue take authorizations only for problem wolves and were issued in conflict with the applicable red wolf 10(j) rule. The authorizations thus violated the ESA.

Plaintiffs remaining claims concern defendants' compliance with the ESA's conservation and consultation mandates and well as NEPA's requirement that agencies take a hard look at proposed actions which may have significant effects on endangered or threatened species. Section

14

4(d) of the ESA requires that the red wolf 10(j) rules must provide for the conservation of the listed species. 16 U.S.C § 1533(d); *see also Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d at 1116 (10(j) rules are "by definition the promulgation of the protective regulations for the species pursuant to the authority of ESA section 4(d)."). Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), *"requires the Secretary [of the Interior] and the heads of all other Federal departments and agencies to use their authorities in order to carry out programs for the protection of endangered species." Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 182-83 (1978) (citation omitted) (emphasis added in *Tennessee Valley*). Section 7(a)(1)'s requirements apply to the USFWS. *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 567 (D. Vt. 2005).

Section 7(a)(2) of the ESA requires that each federal agency consult with the Secretary of the Interior ensure that agency action is not likely to jeopardize the continued existence of any endangered or threatened species. 16 U.S.C. § 1536(a)(2); *see also Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008) (Section 7(a)(2) imposes two obligations on federal agencies, the first being "procedural and requir[ing] that agencies consult with the FWS to determine the effects of their actions on endangered or threatened species and their critical habitat" and the second being "substantive and requir[ing] that agencies insure that their actions not jeopardize endangered or threatened species or their critical habitat."). NEPA seeks to prevent damage to the environment by focusing government attention on the environmental effects of proposed agency action. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989). Any agency action having adverse effects on an endangered or threatened species may properly be considered significant action triggering NEPA hard-look requirements. *See Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008).

The Red Wolf Program having been declared a success in 2007, defendants, beginning in approximately 2014 and without consultation or formal review, determined to disregard management guidelines which had been in place since 1999 which distinguished between problem and non-problem wolves in regard to landowner take requests, to cease introductions of wolves into the wild, to cease pup-fostering, and to cease actively attempting to manage the threat from coyotes on the viability of the wild red wolf population. While a shift in any one or some of these activities may fall within the agency's discretion, when taken together, these actions go beyond the agency's discretion and operate to violate USFWS' mandate to recover this species in the wild. As defendants point out, due to a number of factors, including gunshot mortality and the increased presence of coyotes, the wild red wolf population began to gradually decline starting in 2006, but more than 100 red wolves remained in the wild in 2012-2013. *See* [DE 88 at 322]. Notably, however, the wild red wolf population saw a drastic decrease from 2013 to 2015, with only approximately fifty wolves in the wild in 2015. *See* Pl. App. 739. The population decrease coincides with defendants' making internal revisions to its guidelines and management policies, in response at least in part to mounting public pressure against red wolf recovery efforts, and defendants have failed to proffer any other evidence which could be deemed responsible for such change.

Allowing the wild red wolf population to continue to decline, while having access to methodologies which were previously successful in increasing or maintaining the wild population of the species, is an interpretation and application of the red wolf 10(j) rule that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43. It is undisputed that the reintroduction of the red wolf into the Red Wolf Recovery Area is not without its challenges, but absent a change in Congress' mandate or a

decision to delist or reclassify the red wolf under the ESA, the recent USFWS decisions to discontinue successful population management tools while increasing the likelihood that landowner lethal takes will be approved for wolves which historically would not have been subject to take, amount to a failure comply with its affirmative duty to "carry out conservation measures until conservation [is] no longer necessary." *Ctr. for Biological Diversity v. Vilsack*, 276 F. Supp. 3d 1015, 1031 (D. Nev. 2017); *see also Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d at, 1116-17 (Under ESA Section 4(d), USFWS has discretion to issue the regulations it deems necessary and advisable, but the regulation "shall" provide for the conservation of such species.").

Defendants' argument that their current red wolf management efforts are sufficient and within their discretion fails.

> while agencies might have discretion in selecting a particular program to conserve . . . they must in fact carry out a program to conserve, and not an "insignificant" measure that does not, or is not reasonably likely to, conserve endangered or threatened species. To hold otherwise would turn the modest command of section 7(a)(1) into no command at all by allowing agencies to satisfy their obligations with what amounts to total inaction.

*Fla. Key Deer*, 522 F.3d at 1147. Moreover, as was aptly stated by USFWS in 1999, "[w]ildlife are not the property of landowners but belong to the public and are managed by Federal and State governments for the public good. Such concepts and laws do not provide for taking or removal of wildlife from private lands in the absence of a problem." Pl. App. 730.

Defendants themselves have stated that actions such as those it has already undertaken would require compliance under ESA Section 7 and NEPA, Pl. App. 977, and there is no doubt that defendants' decisions to cease wolf introductions while simultaneously increasing the likelihood of authorized lethal takes by landowners "may adversely affect an endangered or threatened species". *Ctr. for Biological Diversity*, 538 F.3d at 1220 (quoting 40 C.F.R. § 1508.27(b)(9) and noting that action would trigger NEPA compliance if this factor is present).

In sum, plaintiffs' have satisfied their burden to demonstrate the above-described actions of defendants were arbitrary and capricious and otherwise violated Sections 9, 4, and 7 of the ESA as well as NEPA.

IV. Appropriate Relief

As the Court has found that summary judgment in favor of plaintiffs is appropriate as to all but plaintiffs' third claim for relief, the Court orders the following injunctive and declaratory relief.

A. Injunctive relief

On September 29, 2016, the Court entered a preliminary injunction enjoining defendants from taking red wolves, either directly or by landowner authorization, pursuant to 50 C.F.R. §§ 17.84 (c)(4)(v) and (c)(10) without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets. The preliminary injunction remains in place and no appellate review has been conducted. Plaintiffs having demonstrated that judgment in their favor is appropriate all but one of their ESA and their NEPA claims, the Court finds that the preliminary injunction should be made permanent. Accordingly, defendants are hereby ENJOINED from taking red wolves, either directly or by landowner authorization, pursuant to 50 C.F.R. §§ 17.84 (c)(4)(v) and (c)(10) without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets.

B. Declaratory relief

Plaintiffs have further demonstrated that they are entitled to declaratory relief as follows:

1. Defendants have violated the red wolf rule, 50 C.F.R. § 17.84(c)(2), and Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(G), by authorizing private landowners to take red wolves on their property without satisfying the express terms of 50 C.F.R. § 17.84(c)(4)(v);

2. Defendants have violated Section 4 of the ESA, 16 U.S.C. § 1533(d), by failing to provide for the conservation of the red wolf and failing to administer the red wolf

18

program in furtherance of the purposes of the ESA through its new interpretation and application of 50 C.F.R. § 17.84(c);

3. Defendants have violated Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), by failing to administer the red wolf recovery program in furtherance of the purposes of the ESA;

4. Defendants have violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), by failing to ensure that implementation of 50 C.F.R. § 17.84(c), in light of new information and modifications to the application of the red wolf rule, is not likely to jeopardize the continued existence of the red wolf;

5. Defendants have violated NEPA, 42 U.S.C. § 4332(2)(c), by failing to comply with NEPA requirements to determine the impacts of interpreting the take exemptions of the red wolf rule.

## CONCLUSION

Accordingly, for the foregoing reasons, plaintiffs' motion for summary judgment [DE 79] is GRANTED IN PART and DENIED IN PART. Plaintiffs' third claim for relief is DISMISSED as MOOT, and plaintiffs' are entitled to summary judgment in their favor on their remaining claims. Defendants' motion for summary judgment [DE 85] is GRANTED IN PART as to plaintiffs' third claim for relief and DENIED IN PART as to plaintiffs' remaining claims. Declaratory and injunctive relief is ORDERED as provided above.

SO ORDERED, this 4TH day of November, 2018.

Terrence W. Boyle
TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE